New York State Mortgage Loan Enforcement & Administration Corporation et al., Appellants, v Coney Island Site Five Houses, Inc., et al., Respondents; et al., Defendants. (And Another Title.)

Second Department, July 8, 1985

## APPEARANCES OF COUNSEL

*Richard S. Pergolizzi (Donovan Leisure Newton & Irvine [Frank S. Ioppolo* and *J. Peter Coll, Jr.]* of counsel), for appellants.

*Olnick, Boxer, Blumberg, Lane & Troy* and *Wildman, Harrold, Allen & Dixon (Michael L. McCluggage, Donald A. Derfner, John H. Beers* and *Martin J. Hatlie* of counsel), for respondents. (One brief filed.)

## OPINION OF THE COURT

NIEHOFF, J.

These lawsuits involve two State-subsidized low-income housing projects located next to each other in Coney Island which are owned and operated by the same principals, albeit under different names (hereinafter referred to collectively as defendant owners). Plaintiff New York State Project Finance Agency (PFA) is the holder of two mortgages, one on each of the projects. Plaintiff New York State Urban Development Corporation (UDC) was the original mortgagee on both mortgages. Plaintiff New York State Mortgage Loan Enforcement & Administration Corporation (MLC) is a subsidiary of UDC created to enforce the rights of UDC and PFA under the mortgages held by them. In these actions, plaintiffs seek to foreclose on the mortgages by reason of defendant owners' default in the payment of principal, interest and other charges totaling more than $6.5 million for the two projects. These defendants do not deny that they have failed to make such payments, but have raised numerous affirmative defenses and counterclaims in an effort to defeat plaintiffs' right to foreclose.

Presently at issue are four affirmative defenses and their corresponding counterclaims which Special Term declined to dismiss. Although the defenses are stated under the various legal headings of estoppel, unconscionable acts and unclean hands, bad faith and waiver, the court considered them all to be based upon the same allegations — those set forth in connection with the affirmative defense of estoppel.

The factual contentions of the defendant owners are essentially threefold. First, they contend that UDC knowingly planned and structured the projects in such a way that they could not generate sufficient rental income to service the mortgage debt. These allegations also comprised the core of the defendant owners' fraud defense and counterclaim, which Special Term dismissed as presenting "no *bona fide* triable issue of

fact". The defendant owners further complain that the New York State Commissioner of Housing and Community Renewal (DHCR) subsequently refused to approve sufficient rent increases to enable them to service the debt. Finally, according to the defendant owners "[p]laintiffs and the defendant Commissioner" of DHCR deferred servicing the debt from "around 1975" to the present, and "assured [them] that * * * the Mortgage[s] would be restructured to permit [them] to meet all of [their] financial obligations, including debt service [and that] the Mortgage[s] would not be foreclosed". It is claimed that on the basis of those assurances, they continued to operate the projects at a deficit and "lost opportunities to pursue alternatives to foreclosure".

After noting the defendant owners' contentions, Special Term posed the following question: "[S]hould the State through its appropriate agencies be permitted to declare a default and foreclose on mortgages which have not been paid where the State's (through other of its agencies) own conduct (e.g., failure to approve rent increases which would be sufficient to enable the defendants to make debt service payments, the sanctioning of the continued deferral of debt service, and assuring the defendants that the deferral would not constitute a default) may have been responsible?" Special Term answered "no" to the foregoing rhetorical question and found that the allegations of the defendant owners were not feigned and that they raised triable issues of fact requiring a trial of these actions.

■■ We conclude that the affirmative defenses and counterclaims in question are without merit because (1) the alleged oral representations of the plaintiffs are negated by the explicit provisions of the parties' written agreements, and (2) the alleged representations of the defendant DHCR are not attributable to nor binding upon the plaintiffs. Consequently, plaintiffs are entitled to summary judgment of foreclosure.

### THE PARTIES

Plaintiff New York State Urban Development Corp. is a public benefit corporation established in 1968 as part of a State program designed to encourage the private sector to invest in, develop, construct and operate low-income housing in blighted areas (L 1968, ch 174, §§ 2, 4, as amended). As a means of accomplishing its statutory purpose, UDC would provide low-interest mortgage loans to companies called "housing companies" formed by individuals or entities in the private sector. The benefits to the private investors come from the combination of low capital investment, low interest rates, and high tax deduc-

tions. Private investors need only contribute 5% of the total cost of the project, with below-market loans making up the balance of the cost. Because the resulting mortgage loans are of the nonrecourse variety, the investors are shielded from any personal liability beyond their initial contribution, regardless of the operating results, making the projects themselves the only collateral for the loans that finance 95% of their cost. The investment, therefore, yields substantial tax shelter advantages, since in return for their 5% contribution, the private investors are entitled to take depreciation based upon the full construction cost of the project, as well as all of the interest deductions, against other income.

In return for the foregoing advantages, the housing companies must assume responsibility for the management of the projects and subject themselves to certain restrictions (Private Housing Finance Law § 13 [2]; 9 NYCRR 1725-2.1 through 1725-2.9). Return on equity prior to the retirement of the mortgage loans is limited to not more than 6%, and rent levels are subject to administrative approval.

In the mid-1970's, UDC found itself in dire financial straits and was unable to sell the bonds which enabled it to make its loans. To help resolve this crisis, the Legislature created the plaintiff New York State Project Finance Agency (L 1975, ch 7, § 2), which by specific provision of the statute creating it, functions as the exclusive mortgagee with respect to the mortgages it acquires (New York State Project Finance Agency Act [L 1975, ch 7, § 2], § 5 [16], as amended). Thereafter, many mortgages originally held by UDC were assigned, pledged or sold to PFA. Thus, the two mortgages at issue here were acquired by PFA in May of 1975.

Plaintiff New York State Mortgage Loan Enforcement & Administration Corporation was created as a subsidiary of UDC for the purpose of exercising the rights and powers of UDC and PFA in connection with their respective mortgage loan portfolios. MLC was subsequently given a power of attorney by PFA to prosecute these foreclosure actions.

Also in 1975, as part of the response to the aforementioned fiscal crisis, the supervisory functions formerly exercised by UDC in connection with these housing projects were transferred to the Executive Department of the State of New York, and specifically to defendant New York State Commissioner of Housing and Community Renewal. Under the existing statutory scheme, although the individual housing companies establish the initial rents and can request rent increases for their projects,

the rents are subject to DHCR approval (Private Housing Finance Law § 31 [1] [a]). In addition to rent approval, DHCR is vested with other statutory powers, such as the power to approve the housing company's formation and capital structure (Private Housing Finance Law §§ 13, 14, 21); to find that certain statutory preconditions to the making of the mortgage loans are satisfied (Private Housing Finance Law § 26); and to consent to the construction, reconstruction, rehabilitation, improvement or alteration of any project (Private Housing Finance Law §. 27 [4]). However, the mortgagee, PFA, is not empowered to make any rent determinations or to exercise any form of supervisory control over a housing company's management or operation of a project. In a word, the role of PFA is no different than that of a mortgagee in the private sector.

The defendants Coney Island Site Five Houses, Inc., and Coney Island Site Seven Houses, Inc., are housing companies formed by the Sea Park East Company and Sea Park West Company, respectively, and are the legal and equitable owners of the two housing projects with which we are concerned. Pursuant to Private Housing Finance Law §§ 34 and 94, the DHCR is required to be made a party to these foreclosure actions. The State of New York and the City of New York have been made parties defendant by virtue of certain liens they may have upon the premises due to unpaid taxes. The John Doe defendants are the tenants of the premises.

## THE MORTGAGES

The mortgages sought to be foreclosed herein were in the following amounts, $14,359,000 on the Site Five Houses project and $20,356,000 on the Site Seven Houses project. By the time suit was commenced, arrearages of unpaid principal, interest and other charges totaled more than $6.5 million for both projects. Notably, the defendant owners have never denied that they failed to make the payments called for by the mortgages.

## THE FORECLOSURE ACTIONS

The foreclosure actions before us were commenced in September 1982.

By answers dated December 6, 1982, the defendant owners denied the material allegations of the complaints and set forth 11 affirmative defenses and 5 counterclaims. In those affirmative defenses and counterclaims said defendants request, *inter alia,* rescission of the mortgages; a declaration that the plaintiffs had waived their right to insist upon foreclosure; or a modification of the mortgages by restructuring the debt service pay-

ments. That is, these defendants not only seek to avoid foreclosure at this juncture, thereby obtaining forgiveness for all of their past defaults, but also a court-ordered continuance into the future of their unilaterally altered obligations under the notes and mortgages.

After the answers were interposed, plaintiffs moved in both actions, *inter alia,* to dismiss these defendants' affirmative defenses and counterclaims and for summary judgment. Special Term granted that branch of the plaintiffs' motions which were for summary judgment to the extent of dismissing a number of the affirmative defenses and the first counterclaim in both actions, but denied dismissal of the fifth, sixth, part of the seventh, and eighth affirmative defenses and the second through fifth counterclaims, holding that said defenses and counterclaims were legally sufficient and raised factual issues which precluded the entry of summary judgment. For the reasons set forth below, we conclude that Special Term erred in failing to dismiss all of the affirmative defenses and counterclaims, and hold that the plaintiffs are entitled to summary judgment of foreclosure.

### THE DEFENSES AND COUNTERCLAIMS RELATING TO
### THE ACTIONS AND CONDUCT OF THE PLAINTIFFS

In its decision, Special Term grouped the surviving defenses and counterclaims, and correctly found that they were "all based upon the same set of allegations". One branch of these allegations pertains to the alleged premortgage conduct of the plaintiff UDC and the deferral of debt service by the plaintiffs. The second branch of the allegations concerns itself with the actions undertaken and the representations made by certain personnel employed by defendant DHCR.

With respect to the former, we hold that any proof concerning premortgage representations is precluded as a matter of law by the terms of the parties' written agreements. With respect to the latter, we hold that the plaintiffs and defendant DHCR are independent and distinct entities, and that the plaintiffs cannot be bound by the actions and statements of defendant DHCR.

Addressing these issues, *ad seriatum,* we note that the documentary evidence establishes that the parties' initial agreements were outlined in "Development Letters" executed by UDC, Starret Brothers and Eken Development Corp. (the original developer and managing general partner), and the Coney Island Site Seven and Coney Island Site Five housing companies on or about January 18, 1971 and February 5, 1971, respectively. At that time, it was agreed, *inter alia,* that UDC would

provide mortgage loans for 95% of the total construction costs of both projects, leaving Sea Park East and Sea Park West to provide the remaining capital. The initial mortgage agreements executed by UDC and the Coney Island Site Seven and Site Five Houses are dated October 22, 1971 and September 14, 1971, respectively. Pursuant to said mortgages, the failure to make debt service payments constituted a default. In addition, each contained a "no waiver" provision which stated that "[n]o failure by UDC or any Mortgagee to insist upon the strict performance of any term hereof or of the Note, the Building Loan Agreement, the Equity and Regulatory Agreement or the Stock Pledge Agreement or to exercise any right, power or remedy consequent upon a breach hereof or thereof shall constitute a waiver of any such term or of any such breach". Finally, each mortgage contained a provision stating that "[t]his Mortgage may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought. All notices, consents, approvals, waivers, acceptances and similar communications hereunder must be in writing".

At the same time that the parties executed the initial mortgages, they also executed "Equity and Regulatory Agreement[s]" which contained provisions stating that "[i]t is expressly understood that * * * UDC makes no warranties or representations of any kind (a) with respect to any * * * financial schedules * * * provided * * * to the Housing Company, the Partnership, any partner thereof or any other persons in connection with the Project, (b) with respect to the availability of the Governmental Subsidies, or (c) with respect to the feasibility of the Project". The agreements also provided that reliance upon such documents or information by the "Housing Company, the Partnership and others" is "at their own risk". The Equity and Regulatory Agreements also contained a "no waiver" provision stating that "[n]o failure by UDC to insist upon the strict performance of any provision of this Agreement or to exercise any right, power or remedy consequent upon a violation, by any other party hereto, of any provision hereof * * * shall constitute a waiver of the requirements of any such provision or waiver of such violation or failure". Finally, the Equity and Regulatory Agreements specifically provided that the provisions thereof could not be modified or waived except in writing. In 1974, when the parties closed the final financing of the projects, they executed amended mortgages and amended notes. Each of the amended mortgages expressly reaffirms the original mortgage terms, stating that "except as expressly set forth herein", all the

terms of the mortgage shall "remain in full force and effect". In addition, the final two mortgage notes carried forward the provision against oral changes or waiver, stating that "This Note may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge of the Note is sought."

In spite of the above clearly worded documents, the defendant owners claim that foreclosure cannot be had because (1) UDC knowingly planned and structured the projects in such a way that they could not generate sufficient rental income to service the mortgage, and (2) the plaintiffs have deferred debt service from 1975 to the present. That is, the defendant owners maintain that by their misrepresentations plaintiffs induced them to enter into the various agreements, and that plaintiffs have waived their foreclosure rights by their past conduct.

Claims not unlike those proffered by the defendant owners were rejected by this court on a summary judgment motion in *New York State Urban Dev. Corp. v Garvey Brownstone Houses* (98 AD2d 767, 771), where it was stated: "In the face of the outstanding conflict between the alleged oral representations and the uncontroverted documentary evidence containing the written terms of the letter agreement, the 'Equity and Regulatory Agreement' and the 'Consolidation Agreement', appellant cannot claim justifiable reliance and, thus, has failed to establish the elements of a defense of fraud in the inducement or estoppel (see *Merchants Nat. Bank & Trust Co. v Syracuse Eagles Hockey Club Corp.,* 58 AD2d 1004)."

Similarly, in the case at bar, the claims put forth by the defendant owners are totally at odds with the terms of the parties' written loan documents, which show that they intended to be bound only by the terms of said writings. The documents themselves specifically contradict these defendants' account of the premortgage representations purportedly made by the plaintiffs, and emphatically state that actions such as the deferral of debt service would *not* constitute a waiver of plaintiffs' foreclosure rights. Consequently, we hold that the defendant owners have failed to demonstrate by admissible evidence the existence of a factual issue requiring a trial with respect to (1) the alleged premortgage representations made by the plaintiffs or (2) the alleged deferral of debt service payments by the plaintiffs.

THE DEFENSES AND COUNTERCLAIMS RELATING TO THE

ACTIONS AND REPRESENTATIONS MADE BY DHCR PERSONNEL

In addition to arguing that the misconduct of the plaintiffs precludes their right of foreclosure, the defendant owners assert

that their loan and mortgage defaults were caused or condoned by DHCR in its supervisory capacity in connection with the projects, and that DHCR's actions are attributable to the plaintiffs. More specifically, it is contended that, through its employees, DHCR has deferred the payment of debt service until the present time; represented that deferral of debt service would not constitute a default; refused to approve sufficient rent increases so that debt service could be paid; and allocated tenants' rent payments to repairs, maintenance and security instead of to the payment of debt service. On this issue, Special Term grouped the plaintiffs together with defendant DHCR and ruled that it would be inequitable to permit the plaintiffs to declare a default and foreclose on the mortgages. We hold that as a matter of law, DHCR and the plaintiffs are separate and independent entities. Furthermore, we hold that DHCR is not the mortgagee, and that as a result, DHCR had neither the right nor the power to waive or defer these defendants' obligations under the mortgages.

On this appeal, we must assume the truth of the allegations of the defendant owners to the effect that certain of the DHCR personnel made representations to them concerning debt deferral, and that said employees stated that the deferral of debt service would not constitute a default. While we are so bound to assume the truth of these allegations, it does not necessarily follow that the statements of the DHCR personnel are to be imputed to the plaintiffs. On the contrary, the record establishes that the plaintiffs are legally and factually distinguishable from defendant DHCR, and that neither the actions nor statements of DHCR personnel can be attributed to the plaintiffs so as to preclude their rights of foreclosure.

As noted above, plaintiff PFA is an independent public benefit corporation empowered by law to finance housing construction pursuant to New York's Private Housing Finance Law. In 1975, when UDC was in financial trouble, the Legislature split UDC's functions and assigned them to two different agencies, PFA and DHCR. PFA is a "separate corporate governmental agency" (New York State Project Finance Agency Act [L 1975, ch 7, § 2], § 2) empowered by law to finance housing projects, but it has no authority to make rent or other supervisory determinations in connection therewith. In contrast, DHCR, as a division of the Executive Department of the State of New York (Executive Law § 31 [6]; § 260), is charged with the responsibility of supervising the housing projects and deciding upon rent increases (L 1975, ch 7, § 2 [§ 15], as amended; Private Housing Finance Law § 31 [1] [a]).

The purpose and powers of PFA, the plaintiff mortgagee, are set forth in various statutes. Thus, the Laws of 1975 (ch 7, § 2 [§ 5], as amended) provide, *inter alia,* that "[e]xcept as otherwise limited by this act and subject to the provisions of any contract with noteholders or bondholders, the agency shall have power:
* * *

"15. To consent to the modification, with respect to rate of interest, time of payment of any installment of principal or interest, security, or any other term, of any eligible loan, eligible loan commitment, eligible purchase, eligible purchase commitment, contract or agreement of any kind to which the agency is a party;

"16. To exercise *exclusively* all rights of the mortgagee under any corporation first mortgage purchased by the agency or assigned to secure any eligible loan, to foreclose on any property subject to such mortgage or commence any action to protect or enforce any right conferred upon it by any law, mortgage, contract or other agreement, and to bid for and purchase such property at any foreclosure or at any other sale, or acquire or take possession of any such property; and in such event the agency may complete, administer, pay the principal of and interest on any obligations incurred in connection with such property, dispose of, and otherwise deal with, such property, in such manner as may be necessary or desirable to protect the interests of the agency therein" (emphasis added).

Manifestly, it would defeat the very purpose and ignore the separate structure of the PFA if the employees of an unrelated State agency such as DHCR could deprive said plaintiff of its rights as the holder of the mortgages in question. While the Legislature undoubtedly envisioned a working relationship between PFA and other State agencies such as the DHCR, it permitted the other agencies to render service to this plaintiff only "within their respective functions as may be requested by the [PFA]" (L 1975, ch 7, § 2 [§ 16] [1]). Moreover, in creating PFA, the Legislature not only empowered the agency to issue bonds and notes (L 1975, ch 7, § 2 [§§ 6, 8], as amended), but also provided that the State would not interfere with the agency's ability to fulfill its obligations to its bondholders by providing that:

"Agreement with the state

"The State does hereby pledge to and agree with the holders of any notes or bonds issued under this act, that the state will not limit or alter the rights hereby vested in the agency to fulfill the terms of any agreements made with the holders thereof, or in

any way impair the rights and remedies of such holders until such notes or bonds, together with the interest thereon * * * are fully met and discharged" (L 1975, ch 7, § 2 [§ 11]).

For the State, through DHCR, to modify or waive the terms of PFA's mortgages would quickly undermine the value of PFA's mortgage portfolio, and would, therefore, breach that statutory agreement (see, Patterson v Carey, 41 NY2d 714). Thus, any argument that DHCR's actions are to be attributed to PFA simply because they are both instrumentalities of the State, must fail.

The defendant owners' final attempt to avoid foreclosure is premised upon the purportedly improper rent determinations made by defendant DHCR. As can be seen from the above analysis, we reject this additional effort to charge the plaintiffs with those determinations. If the defendant owners were dissatisfied with the amount of rent increases being granted to them, they could have raised the issue in a petition for review pursuant to CPLR article 78.

### CONCLUSION

The documentary proof submitted in support of that branch of plaintiffs' motion which was for summary judgment, coupled with the fact that the defendant owners do not deny that they failed to make the called for mortgage payments, establishes that plaintiffs are prima facie entitled to relief. "[W]here the moving party has demonstrated its entitlement to summary judgment, the party opposing the motion must demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action or tender an acceptable excuse for his failure so to do" (Zuckerman v City of New York, 49 NY2d 557, 560).

Here, the defendant owners have failed to adduce such evidence. The record before us reveals that the affirmative defenses and counterclaims challenged on this appeal are without merit because (1) the alleged oral representations of the plaintiffs are negated by the explicit provisions of the parties' written agreements, and (2) the alleged representations of defendant DHCR are not attributable to nor binding upon the plaintiffs. Consequently, that branch of plaintiffs' motion which was for summary judgment of foreclosure against the defendant owners and to strike certain of their affirmative defenses and counterclaims should have been granted.

MOLLEN, P. J., BRACKEN and O'CONNOR, JJ., concur.

Order of the Supreme Court, Kings County, dated September 14, 1983, reversed insofar as appealed from, on the law, without

costs or disbursements, and those branches of plaintiffs' motions which were for summary judgment in their favor and against respondents and to strike certain of respondents' affirmative defenses and counterclaims granted.