12-2481-cv
Gaia House Mezz LLC v. State St. Bank & Trust Co.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: April 8, 2013                    Decided: June 12, 2013)

Docket No. 12-2481-cv

_____

GAIA HOUSE MEZZ LLC,

*Plaintiff - Counter-Defendant - Appellee*,

and

WEST SKY, LLC, 200 11TH 11S LLC, 24TH STREET CAPITAL GROUP I LLC,

*Plaintiffs - Appellees*,

and

YOUNG WOO, MARGARETTE LEE, GLAUCO LOLLI-GHETTI,

*Counter-Defendants - Appellees*,

v.

STATE STREET BANK AND TRUST COMPANY,

*Defendant - Counter-Claimant - Appellant.**

_____

* The Clerk of Court is directed to amend the official caption to conform with the above.

Before:

   WALKER and CHIN, Circuit Judges, and RESTANI, Judge.[**]

_____

   Appeal from the judgment of the United States District Court for the Southern District of New York (Griesa, <u>Judge</u>) finding Defendant - Counter-Claimant - Appellant State Street Bank and Trust Co. ("State Street") unlawfully demanded approximately $4.5 million in interest and $370,000 in attorney fees, requiring State Street to return the same to Appellees, and finding State Street liable for $328,097 in damages resulting from the unlawful demand. We find the district court erred in concluding that equitable estoppel, the principle of good faith and fair dealing, or general principles of equity prevented State Street from demanding payment of the interest and attorney fees. Accordingly, the judgment of the district court is REVERSED.

_____

ANDREW C. PHELAN (DINA R. KAUFMAN, *on the brief*), Bingham McCutchen LLP, Boston, Massachusetts, *for Defendant - Counter-Claimant - Appellant*.

PETER M. RIPIN (GARY I. LERNER, *on the brief*), Davidoff Hutcher & Citron LLP, New York, New York, *for Appellees*.

_____

RESTANI, *Judge*:

   Appellee Gaia House Mezz LLC ("Gaia") and State Street were bound by a mezzanine loan[1] agreement for the construction of a residential building in Manhattan. After a difference over monies owed, Gaia initiated this action, alleging principles of equity prevented State Street from demanding payment of approximately $4.5 million in interest and approximately $370,000

_____

[**] The Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designation.

[1] A mezzanine loan is junior loan secured by a pledge of equity interests in a particular company. It is generally subordinate to mortgages and other primary debt secured by real property.

in attorney fees. Following a bench trial, the United States District Court for the Southern District of New York (Griesa, <u>Judge</u>) entered judgment in favor of Gaia on the interest and attorney fee issues and required State Street to pay an additional $328,097 in damages. We reverse and find that State Street is entitled to the $4.5 million in interest and attorney fees and is not liable for damages.

## BACKGROUND

In December 2006, Gaia entered into a mezzanine loan agreement (the "Agreement") with Lehman Brothers to help finance the construction of a residential building. The Agreement was secondary to Gaia's loan with iStar FM Loans LLC ("iStar") of approximately $45 million. After Lehman Brothers' bankruptcy in September 2008, State Street assumed Gaia's loan. Gaia failed to pay off any of its debt to State Street by the initial Maturity Date of July 1, 2009 and committed several other Defaults.[2] At the time of the initial Maturity Date, Gaia owed State Street approximately $20.7 million in principal and $10.1 million in interest.

In September 2009, State Street and Gaia modified the Agreement with the Second Loan Modification Agreement ("Second Modification"), which expressly waived Gaia's prior Defaults, including its failure to achieve Substantial Completion by the date specified in the Agreement. The Second Modification established a new Maturity Date of January 2010, with the option to extend the Maturity Date four times up to July 2011. The Second Modification included as Events of Default the failure to obtain a Temporary Certificate of Occupancy ("TCO") for Penthouse #2 ("PH2") by April 15, 2010 or the failure to attain Substantial Completion by June 30, 2010.

---

[2] Capitalized terms refer to those terms as defined in the Agreement. Unless otherwise specified, reference to the Agreement includes reference to all modifications.

In addition to new deadlines, the Second Modification created several new provisions relevant here, including the Accrued Interest Waiver, the Affiliate Purchase Right, and the Lockbox Agreement. The Accrued Interest Waiver provides:

> On the Maturity Date, the entire Debt, if not sooner paid, shall become due and payable in full. Notwithstanding the foregoing, if the entire Debt, other than the . . . [Accrued Interest], is paid in full on the Scheduled Maturity Date and no Event of Default occurs prior to such Scheduled Maturity Date, Lender shall waive the payment of Accrued Interest from Borrower . . . .

J.A. 802-03 (Second Modification). This had the effect of freezing interest at $10.1 million and providing an interest-free loan on the $20.7 million in principal, provided there were no future Events of Default. Gaia's monthly statements reflected the calculation of the monthly interest and tracked the total amount of interest accrued since the initial Maturity Date (the "Accrued Interest").

The Affiliate Purchase Right provision states that "Borrower or an Affiliate of Borrower shall be allowed to purchase any of Residential Units . . . 8N, . . . 11S, [or] PH1 . . . in order to satisfy the Loan and Senior Loan reduction covenants described above at the applicable 'Minimum Unit Sales Price.'" J.A. 809 (Second Modification). This provision enabled Gaia, or its affiliates, to purchase the specified units in order to avoid a default and a quick foreclosure. The Second Modification also incorporated the Amended and Restated Mezzanine Lockbox Agreement ("Lockbox Agreement"), which provided a mechanism for the distribution of proceeds from the sale of units. Proceeds would be distributed in a specified priority such that State Street's loan would be paid in full, then Gaia could recoup its equity investments, and any remaining proceeds would be split 50/50 between Gaia and State Street until all units were sold.

After the Second Modification, Gaia committed several Events of Default, including the failure to obtain a TCO for PH2 by April 15, 2010. In May 2010, the parties agreed to the Third

4

Loan Modification Agreement ("Third Modification"). The Third Modification expressly waived the previous Event of Defaults, including the failure to obtain TCOs. The Third Modification also extended the deadline to obtain a TCO for PH2 and attain Substantial Completion to July 15, 2010 and extended the Maturity Date to January 15, 2011 pursuant to the Third Extension option. The Third Modification repeated relevant provisions of the Second Modification, including the Accrued Interest Waiver and the Affiliate Purchase Right.

Gaia failed to obtain a TCO for PH2 and failed to achieve Substantial Completion by the specified deadline of July 15, 2010. Despite these Events of Default, the parties took action otherwise required by the Agreement, Gaia closed on several apartments during the summer of 2010, and Gaia made its final payment to iStar in August 2010.

On December 2, 2010, State Street provided written notice that Gaia's failure to achieve Substantial Completion and obtain a TCO for PH2 by July 15, 2010 constituted Events of Default. On December 13, 2010, Gaia obtained the TCO for PH2. On January 7, 2011, State Street notified Gaia in writing that, because of the Events of Default, State Street was not required to waive the Accrued Interest. The letter also noted State Street would agree to the Fourth Extension option to the Maturity Date, despite the Events of Default, provided certain other conditions, not relevant here, were satisfied. State Street reserved all rights and remedies with respect to the Events of Default and stated:

> Nothing contained in this letter, including without limitation, State Street's willingness to agree to the exercise of the Fourth Extension Opinion as noted above despite the Specified Defaults, or any delay on the part of State Street in exercising any of its rights and remedies under the Loan Agreement . . . shall be considered to be a waiver or modification thereof or of State Street's entitlement to the payment of Accrued Interest.

J.A. 1699 (State Street Jan. 7, 2011 Letter to Gaia).

5

In February 2011, Gaia obtained a loan from Doral Bank in order to purchase the remaining three unsold units and replace State Street as the lender. On March 15, 2011, Gaia notified State Street of its intention to exercise the Affiliate Purchase Right and purchase the remaining three units for the minimum contract price. On March 24, State Street responded that it did not object to Gaia's use of the Affiliate Purchase Right. State Street again observed that two Events of Default had occurred and declared that it was "not required to waive, and will not waive, the payment of Accrued Interest." J.A. 1741 (State Street Mar. 24, 2011 Letter to Gaia). Gaia's affiliates purchased the remaining three units for the minimum contract price. The resulting proceeds did not cover all of Gaia's equity, and thus, State Street did not receive profits under the 50/50 profit sharing provision of the Lockbox Agreement.

In July 2011, Gaia paid off the remaining $4.1 million in principal. Under protest, Gaia also paid approximately $4.5 million in Accrued Interest and $370,000 in Professional Fees. Because Gaia had not planned to pay the Accrued Interest, it was forced to obtain $328,097 in additional financing from Doral Bank (the "Doral damages") in order to make the final payment.

Gaia then initiated this litigation, alleging it was entitled to a return of the Accrued Interest and Professional Fees and that State Street was liable for the Doral damages. State Street counterclaimed for a declaratory judgment that it was entitled to the Accrued Interest and that it was not liable for the Doral damages. State Street also requested attorney fees incurred in this litigation pursuant to the Agreement's Professional Fee provision. Following a bench trial, the district court found equity required State Street to return the Accrued Interest and Professional Fees paid by Gaia and that State Street was liable for the Doral damages. State Street now appeals.

6

**JURISDICTION AND STANDARD OF REVIEW**

The district court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. "Under New York law . . . if a contract is unambiguous on its face, its proper construction is a question of law." Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (citation omitted). Mixed questions of law and fact are reviewed de novo; factual findings are reviewed for clear error. Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 51-52 (2d Cir. 2011).

**DISCUSSION**

**I.      Accrued Interest**

It is undisputed that State Street did not violate any terms of the Agreement by demanding payment of the Accrued Interest and that Gaia failed to obtain the TCO for PH2 or attain Substantial Completion by the dates specified in the Agreement. The only issues on appeal are whether equitable estoppel, principles of good faith and fair dealing, or general principles of equity prevent State Street from keeping the Accrued Interest.

**A.      Equitable Estoppel**

Under New York Law, a claim for equitable estoppel "rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury." Nassau Trust Co. v. Montrose Concrete Prods. Corp., 436 N.E.2d 1265, 1269 (N.Y. 1982) (citation and internal quotation marks omitted). The party alleging equitable estoppel must demonstrate:

> (1) An act constituting a concealment of facts or misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoers; (4) Reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment.

7

Gen. Elec. Capital Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994).

The district court found that State Street committed an act of concealment by not providing immediate notice that two Events of Default had occurred and instead waiting nine months before informing Gaia that payment of the Accrued Interest was required. It found that State Street's silence was intended to perpetuate the idea that Gaia was entitled to a waiver of the Accrued Interest and to induce Gaia into continuing with the project.

The district court's finding fails as a matter of law, because a party's silence does not give rise to a claim of equitable estoppel when the party has no duty to speak. Compare Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85, 94 (2d Cir. 2003) (finding defendant's silence could not give rise to equitable estoppel because defendant had no duty to speak), with Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725-26 (2d Cir. 2001) (finding silence constituted an act of concealment when employer had legal obligation to provide notice). Here, Gaia agreed, per the terms of the Agreement, that once a described default occurred, "then an 'Event of Default' . . . shall automatically exist"; that State Street had no obligation to accept any cures; and that, in response to such Events of Default, State Street could "take such action, without notice or demand, as Lender deems advisable." J.A. 2027, 2030-32 (Compilation of Key Contract Terms). Thus, State Street did not have a duty to provide Gaia notice of the Events of Default or of its intention to collect interest, and its silence cannot give rise to a claim of equitable estoppel.

The district court disregarded the above provisions of the Agreement because it found that State Street routinely disregarded the Agreement when it suited State Street's interests. Specifically, the district court noted that State Street granted the Fourth Extension option, even

8

though under the Agreement the extension was not available in the Event of a Default, and State Street consistently ignored the definition of Substantial Completion.

In addressing this reasoning, we first acknowledge that "any written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." Harold J. Rosen Trust v. Rosen, 386 N.Y.S.2d 491, 499 (App. Div. 1976), aff'd, 401 N.Y.S.2d 66 (1977). Accordingly, whether State Street's course of performance was inconsistent with the terms of the Agreement requires us to first consider these terms. Under the Agreement, State Street was permitted to "at any time and from time to time waive any one or more of the conditions, requirements or obligations contained herein." J.A. 2034 (Compilation of Key Contract Terms). Gaia agreed that "any such waiver shall be deemed to be made in pursuance hereof and not in modification thereof, and any such waiver . . . shall not be considered a waiver of such condition in any other instance or any other circumstance." Id. Additionally, the Agreement provided that in order to be effective, a waiver must be made expressly and in writing, and "the failure of Lender to insist upon strict performance of any term hereof, shall not be deemed to be a waiver of such term." Id.

Turning to State Street's course of performance, the record demonstrates that when State Street waived provisions of the Agreement, including the requirement to obtain Substantial Completion, it did so expressly and in writing, while reserving all other rights. When State Street waived the Events of Default for purposes of the Fourth Extension option, it did so expressly and in writing, as required by the Agreement. State Street also expressly stated in writing that the waiver of the Events of Default for purposes of the Fourth Extension option had no effect on State Street's ability to require payment of the Accrued Interest, consistent with the

9

Agreement provision that a waiver in one instance should not be considered a waiver in any other circumstances. Additionally, even if State Street did not insist on Gaia's strict performance of its obligation to obtain Substantial Completion prior to its final payment to iStar, Gaia agreed that State Street's failure to insist on strict performance of a particular term "shall not be deemed to be a waiver of such term." Id. Thus, State Street's course of performance, including its disregard of particular contractual obligations on Gaia's part from time to time, was consistent with the Agreement, and the Agreement remains enforceable. See John Doris, Inc. v. Solomon R. Guggenheim Found., 618 N.Y.S.2d 99, 100 (App. Div. 1994) (reaffirming the obligation of the courts to enforce the terms as agreed to by the parties).

Returning to whether there was a misrepresentation or omission, Gaia argues that emails and the monthly account statements from Trimont Real Estate Advisors, Inc. ("Trimont"), the company contracted to service State Street's accounts, indicated that State Street would not collect the Accrued Interest. The Trimont statements tracked the total amount of Accrued Interest in an "Uncapitalized Deferred Interest Balance" line item but did not specifically state that the interest was due or add the interest to the loan's total balance.[3] After receiving the August 2010 Trimont statement, which included an Uncapitalized Deferred Interest Balance of over $3 million, Gaia sent an email asking Trimont to confirm that the Accrued Interest would be

---

[3] The Trimont Statements cannot reasonably be interpreted as indicating that Gaia is entitled to the Accrued Interest Waiver or that State Street would never attempt to collect the Accrued Interest. If State Street had no intention to collect the Accrued Interest, there would be no reason for Trimont to continue calculating the interest each month and tracking the total. Although the Accrued Interest was not added to the loan's balance at the end of each month, this merely reflected the parties' agreement not to capitalize the Accrued Interest.

10

due only if there were an Event of Default. Trimont confirmed that was correct, but did not state whether an Event of Default had occurred.[4]

Even if the monthly statements or emails are misleading in that they do not state that an Event of Default had occurred or that the Accrued Interest would come due, Gaia's reliance on them is unreasonable. Gaia does not dispute that it failed to obtain a TCO for PH2 by July 15, 2010 or that the Agreement defines such a failure as an Event of Default. As a sophisticated real estate developer who negotiated the Agreement with counsel, Gaia had to look no further than to the plain language of the Agreement to know that an Event of Default had occurred and that the Accrued Interest would come due on the Date of Maturity, without further action by State Street. Gaia cannot allege that the representations from Trimont demonstrated that an Event of Default did not occur or that State Street had no intention to collect the Accrued Interest in light of the contractual terms stating otherwise. See Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984) (finding no justifiable reliance when party has access to all of the material facts and the expertise necessary to understand the facts); N.Y. State Mortg. Loan Enforcement & Admin. Corp. v. Coney Island Site Five Houses, Inc., 491 N.Y.S.2d 671, 676 (App. Div. 1985) (finding a party cannot claim justifiable reliance in the face of a conflict between the alleged misrepresentations and the written terms of the agreements).

Even if Gaia had been able to demonstrate reasonable reliance on a misrepresentation or omission by State Street, its claim still fails because it did not demonstrate that the alleged

---

[4] In order to demonstrate reasonable reliance on Trimont's email, Gaia also would need to show it was reasonable to rely on Trimont's interpretation of whether an Event of Default occurred under the Agreement even though Trimont was not a party to the Agreement and was responsible for only servicing State Street's accounts. It has not done so.

11

misrepresentations caused it to change its position to its substantial detriment. The district court found that State Street's silence induced Gaia to expend significant effort in completing construction and selling units during difficult economic conditions. Gaia argues it detrimentally changed its positions as a result of State Street's concealment by: (a) executing the Second and Third Modifications and (b) expending significant time and money to finish the project.

The district court's conclusion that Gaia suffered detrimental reliance by continuing with the project fails as a matter of law. A party cannot establish justifiable reliance by alleging it was induced to perform an existing legal obligation. Organ v. Stewart, 60 N.Y. 413, 420 (1875) (finding no estoppel when "the party claiming the benefit of it has been induced to do only that which he might have been compelled to do"); Am. Prescription Plan, Inc. v. Am. Postal Workers Union, 565 N.Y.S.2d 830, 832 (App. Div. 1991) (rejecting equitable estoppel claim when plaintiff alleged reliance based on conduct that was consistent with its contractual obligations).

Gaia argues it had no existing obligation to agree to the Second and Third Modifications, but it was induced to do so based on State Street's representation that the Accrued Interest would not be collected. The district court found, and Gaia argues, that the alleged concealment and misrepresentations occurred between July 2010 and March 2011. The Second and Third Modifications were agreed to in September 2009 and May 2010, respectively. Gaia's agreement to the Second and Third Modifications, therefore, could not have been in reliance on any alleged concealment because the Modifications were agreed to prior to the alleged concealment period. Additionally, Gaia cannot reasonably argue that it agreed to the Second and Third Modifications in exchange for a promise by State Street not to collect the Accrued Interest. The language of the Accrued Interest Wavier, in both the Second and Third Modifications, is clear that the availability of the waiver is conditioned on there being no Events of Default.

12

Gaia did not demonstrate an omission or misrepresentation by State Street on which Gaia reasonably relied to its substantial detriment.  Accordingly, Gaia cannot rely on equitable estoppel to recover the Accrued Interest.

## B.  Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing prevents any party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (quotation marks omitted).  The doctrine is employed when necessary to "effectuate the intentions of the parties, or to protect their reasonable expectations."  M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (quotation marks omitted).  In order to find a breach of the implied covenant, a party's action must "directly violate an obligation that may be presumed to have been intended by the parties."  Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407-08 (2d Cir. 2006) (quotation marks omitted).  The covenant cannot be used, however, to imply an obligation inconsistent with other terms of a contractual relationship.  Dalton, 87 N.Y.2d at 389.   Here, the district court noted that in the Spring of 2011, State Street could expect to receive $1 million under the profit sharing provision, but would receive over $4 million by declaring the Accrued Interest due.  The district court found that State Street violated the principles of good faith and fair dealing because it did not provide a credible and satisfactory explanation for its decision to require Gaia to pay the approximately $4 million in Accrued Interest.

The district court's conclusions fail as a matter of law because Gaia did not demonstrate that State Street violated an expected obligation.  See Thyroff, 460 F.3d at 407-08.  We cannot presume that the parties intended Gaia to obtain a waiver of the Accrued Interest upon an Event

13

of Default or receive specific notice because these obligations conflict with the express language of the Agreement. See Dalton, 87 N.Y.2d at 389. Additionally, given the terms of the Accrued Interest Waiver, State Street's previous waivers in writing, and the various contractual terms limiting the effect of waivers and estoppel, Gaia did not have a reasonable expectation that State Street would forgo its right to collect the Accrued Interest when State Street had never waived expressly its right to do so.

Because State Street acted consistently with the contract and did not violate a presumed obligation or Gaia's reasonable expectations, it was entitled to act in its own self-interest and require payment of the Accrued Interest, even if such action lessened Gaia's anticipated profits. See M/A-COM Sec. Corp., 904 F.2d at 136 (noting the implied covenant of good faith is not implicated merely because a party acts in its "own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract" (quotation marks omitted)). This is true regardless of the difficult economic conditions facing Gaia. See Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1057 (2d Cir. 1992) ("Even after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain." (alteration and quotation marks omitted)). Additionally, State Street did not need to provide an explanation, let alone a satisfactory explanation, as to why it decided to enforce a valid contract.[5] Thus, State Street's

---

[5] Gaia argues that State Street abused its discretion under the Agreement because State Street decided to require payment of the Accrued Interest only after it learned that it would not share in any future profits under the Lockbox Agreement, and thus, State Street's motives in enforcing the Agreement were retaliatory and inconsistent with the principle of good faith. The principle of good faith constrains a party's actions, not a party's motives for those actions. See Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (describing good faith as a "pledge that neither

(continued...)

14

actions were not taken in bad faith.

### C. General Principles of Equity

Equity may intervene to "prevent a substantial forfeiture occasioned by a trivial or technical breach." Fifty States Mgmt. Corp. v. Pioneer Auto Parks, 46 N.Y.2d 573, 576-77 (1979) (enforcing rent acceleration clause after failure to timely pay rent and noting that the increased burden imposed on tenant after its willful failure to comply with contract's deadlines did not amount to a forfeiture). The "contracted-for financial consequence of the [parties'] own failure to do that which they promised to do" is not a forfeiture. 1029 Sixth, LLC v. Riniv Corp., 777 N.Y.S.2d 122, 128 (App. Div. 2004) (finding tenants' failure to comply with strict vacate date in lease, thereby losing their right under the lease to receive a cash bonus, was not a forfeiture).

The district court found that, by the time State Street demanded the Accrued Interest in March 2011, any Events of Default had been cured and were only technical in nature. Accordingly, the district court found that equity would intervene in order to prevent the forfeiture of over $4 million in Accrued Interest occasioned by such trivial and technical breaches. Gaia further argues that the Events of Default are not material because State Street did not suffer any harm as a result.

The district court erred as a matter of law in concluding that Gaia's obligation to pay the Accrued Interest constituted a forfeiture. The parties agreed that Gaia could earn a waiver of the

---

[5](...continued)
party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (emphasis added) (quotation marks omitted)). Thus, State Street's motives in enforcing its valid contract are irrelevant.

15

Accrued Interest by meeting the deadlines specified in the Agreement. Gaia failed to meet the deadlines, and as a result, it failed to earn the waiver. Thus, Gaia's obligation to pay the Accrued Interest is merely the contracted-for financial consequence of its own failure to do that which it promised to do, and is not a forfeiture. See id.

Additionally, the district court erred in defining the Events of Default as trivial or technical breaches when the parties expressly agreed to designate the Events of Default as material. The Agreement included a time-is-of-the-essence clause, which rendered the deadlines material. See New Colony Homes, Inc. v. Long Island Prop. Grp., LLC, 803 N.Y.S.2d 615, 616 (App. Div. 2005) ("[W]here time is of the essence, performance on the specified date is a material element of the contract, and failure to perform on that date constitutes, therefore, a material breach of the contract."). Additionally, the parties agreed that State Street was authorized not to accept any cures, and any cure "shall . . . not limit, Lender's rights and remedies in respect of any Event of Default." J.A. 2030 (Compilation of Key Contract Terms). Neither Gaia nor the court may re-write the contract to impose its own definition of materiality. See Metro. Life Ins., 906 F.2d at 889 ("The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded." (quotations marks omitted)). Thus, Gaia did not suffer a forfeiture occasioned by a trivial breach, and it cannot rely on general principles of equity to recover the Accrued Interest.

In sum, the Agreement authorized State Street to collect the Accrued Interest, and Gaia failed to prove an equitable remedy excusing it from paying. Accordingly, State Street did not unlawfully demand payment of the Accrued Interest, and it is not liable for the Doral damages.

16

## II.    Professional Fees

The Professional Fee provision provides:

> Borrower covenants and agrees to immediately pay Lender on demand all costs and expenses, including Professional Fees, incurred by Lender in connection with or as a consequence of any of the following . . . : (i) any . . . Event of Default . . .; (ii) the collection of the Debt, (iv) the enforcement of Lender's rights and remedies under the Loan Documents . . . or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting the Project, any Loan Party, the Loan Documents . . . or any Collateral . . . .

J.A. 444-45 (Agreement). The district court found that this provision did not apply because this action was not "in connection with or as a consequence of" an Event of Default, the collection of Debt, or the enforcement of State Street's rights under the Loan Documents. This was incorrect. Interest is included within the Agreement's definition of "Debt," and thus, State Street's counterclaim for the Accrued Interest is in connection with or a consequence of State Street's collection of Debt. Additionally, State Street's counterclaim is connected to the enforcement of State Streets rights and remedies under the Loan Documents, and the attorney fees have been incurred as a consequence of defending an action affecting the Loan Parties and Loan Documents. Accordingly, the Professional Fee provision applies to this action, and State Street is entitled to Professional Fees incurred as a result of this litigation.

## CONCLUSION

For the reasons discussed above, the decision of the district court is REVERSED and judgment shall enter for State Street on the Accrued Interest, Doral damages, and Professional Fee claims. This matter is REMANDED to the district court for further proceedings to determine the amount of Professional Fees that Gaia owes State Street due to this litigation.

17

Such fees and costs will include the monies expended in the initial trial, the appeal, and in any subsequent proceedings, minus any amount Gaia has already paid. The clerk is directed to refer any further appeal following remand to this panel.