Elias **RODRIGUEZ, Plaintiff–Appellee,**

v.

**TENNESSEE LABORERS HEALTH & WELFARE FUND, Defendant–Appellant.**

No. 02–5601.

United States Court of Appeals, Sixth Circuit.

Feb. 6, 2004.

Bill Hodde, Madison, TN, for Plaintiff-Appellee.

R. Jan Jennings, Carrol D. Kilgore, Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, for Defendant-Appellant.

Before BOGGS, Chief Circuit Judge; GIBBONS Circuit Judge; and GWIN, District Judge.*

* The Honorable James S. Gwin, United States District Judge for the Northern District of

## OPINION

GWIN, District Judge.

The Tennessee Laborers Health and Welfare Fund ("Fund"), an ERISA plan administrator, appeals from a district court decision that found it had no right to reimbursement from participant Elias Rodriguez after Rodriguez settled a claim against a third-party tortfeasor. The Fund contends that Rodriguez had no coverage under the ERISA plan and that it erred in paying benefits on his behalf. Moreover, the Fund argues that it has a right to reimbursement from the settlement proceeds that Rodriguez received.

With this appeal, we examine whether the district court: (1) erred when it determined that the Fund construed an ERISA plan provision in an arbitrary and capricious manner; (2) erred when it determined that the Fund was not entitled to reimbursement based on the federal common-law "make whole" rule; and (3) erred when it denied the Fund's motion to alter, amend, or reconsider an interlocutory order.

For the following reasons, we AFFIRM the district court's decisions on all issues the Fund raises in its appeal.

## HISTORY

In July 1997, Rodriguez began work for Skilton Paving and Construction Company ("Skilton"). Skilton contributes to the Fund's employee welfare benefit plan governed by the Employee Retirement Insurance Security Act (ERISA), 29 U.S.C. § 1001 et seq. In October 1997, Rodriguez sustained an on-the-job injury that left him unable to work for Skilton. Following this injury, Skilton continued to pay Rodriguez wages, to document Rodriguez as a full-time employee, and to submit contributions to the Fund on behalf of Rodriguez. At the time, the Fund was unaware that Rodriguez no longer worked for Skilton.

On April 4, 1999, Rodriguez suffered serious injuries in an automobile accident unrelated to his work. Before paying any medical benefits under the plan, the Fund required Rodriguez to sign a subrogation agreement. On June 8, 1999, Rodriguez' wife signed this agreement on Rodriguez' behalf.

Shortly thereafter, Rodriguez requested that the Fund waive any right to subrogation of any recovery he received from a third-party tortfeasor. Rodriguez argued that such limits to insurance coverage would result in his not being fully compensated for his injuries and damages. Rodriguez later informed the Fund's Board of Trustees that he would recover approximately $116,666 through settlements of his claims.

As of November 30, 1999, the Fund had paid approximately $238,638.11 in medical expenses on behalf of Rodriguez. At a March 6, 2000, meeting of the Fund's Board of Trustees, the Board reviewed Rodriquez' request that it not seek reimbursement. The Board unanimously decided to reduce its reimbursement demand to $57,139.94.

Rodriguez requested the Board reconsider its decision. At its May 22, 2000, meeting, the Board again discussed Rodriguez' request. For the first time, the Board considered whether Rodriguez had been entitled to receive any benefits for his injuries sustained in the April 4, 1999, accident. After this May 22, 2000, review, the Board determined that Rodriguez was not an employee covered under the Fund's plan at the time of the April 4, 1999, automobile accident because he had not worked at Skilton since October 1997.

Ohio, sitting by designation.

The Board interpreted the "CONTINUA-TION OF ELIGIBILITY" section of the benefits plan to require that an employee work 130 hours per month to maintain eligibility for benefits. Although the Board gave suggestions regarding how Rodriguez might purchase coverage under COBRA,[1] the Board demanded subrogation of $57,139.94 that Rodriguez would receive from the third-party tortfeasor.

Rodriguez did not make the payments and instead brought suit under ERISA, 29 U.S.C. § 1132(a)(3), in the United States District Court for the Middle District of Tennessee. With his complaint, Rodriguez sought a declaration of his rights under the terms of the plan. Rodriguez asked the district court to find that he was eligible to receive benefits in April 1999 and to prevent the Fund from seeking reimbursement from the settlement recovery. After ordering the Fund to supplement the administrative record with plan documents and amendments in effect from October 1, 1997, through April 30, 1999, the district court entered an interlocutory order. With its order, the district court granted Rodriguez judgment regarding his eligibility for coverage under the plan and the applicability of the common law "make whole" rule to the plan. The Plan subsequently conceded that Rodriguez' recovery had not made him whole, which was the only remaining issue in the case. The Fund moved for reconsideration of the order entering judgment for Rodriguez, and the district court denied that motion. The Fund then filed a timely notice of appeal.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of judgment in an ERISA action. *Wilkins v. Baptist Healthcare Sys., Inc.*

150 F.3d 609 (6th Cir.1998). When an ERISA plan expressly grants a Fund discretionary authority to interpret plan provisions, we review the Fund's interpretation of the provisions under the arbitrary and capricious standard of review. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Hunter v. Caliber Sys., Inc.,* 220 F.3d 702, 711 (6th Cir.2000); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir.1996); *Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co.,* 48 F.3d 365, 371 (8th Cir.1995) (applying arbitrary and capricious standard to a claim brought under 29 U.S.C. § 1132(a)(3)). Review under the arbitrary and capricious standard is the least demanding form of judicial review of an administrative action. Under this standard of review, "we must decide whether the plan administrator's decision was 'rational in light of the plan's provisions.'" *Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir. 1997) (quoting *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988)).

In contrast, this court reviews the district court's denial of the Fund's motion for reconsideration of an interlocutory order for abuse of discretion. District courts possess the authority and discretion to reconsider and modify interlocutory judgments any time before final judgment. *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 12, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"); *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir.1991). Because district courts have broad discretion in this area, we review such decisions under the deferential abuse of discretion

---

1. The Consolidated Omnibus Budget Reconciliation Act (COBRA), codified in ERISA at

29 U.S.C. § 1161 *et seq.*

standard. *See, e.g., Amer. Canoe Ass'n, Inc. v. Murphy Farms*, 326 F.3d 505, 514–15 (4th Cir.2003). This court, however, treats the district court's interpretation and application of the Federal Rules of Civil Procedure as a question of law and reviews the district court's analysis *de novo. Jalapeno Prop. Mgmt., LLC v. Dukas*, 265 F.3d 506, 510 (6th Cir.2001).

## ANALYSIS

### A. Interpretation of Plan Provision

On appeal, the Fund argues that its determination that the health benefits plan covered Rodriguez only when he worked 130 hours in a given month was neither arbitrary nor capricious. Since Rodriguez did not work at Skilton after October 1997, the Fund contends that Rodriguez was not a covered employee at the time of his accident in April 1999.

The plan's CONTINUATION OF ELIGIBILITY section states that an employee "will continue to be eligible [for benefits] so long as one or more contributing Employers shall have paid on his behalf funds representing at least 130 hours of work."

The parties disagree on whether "representing at least 130 hours of work" required that Rodriguez work 130 hours per month to maintain benefit coverage. When read in context of the entire plan, the Fund contends that the phrase means that an employee must work 130 hours per month to maintain coverage. On the other hand, Rodriguez suggests that the phrase merely required Rodriguez' employer to continue to pay an amount equivalent to at least 130 hours of work per month to the Fund. If this Court finds the provision ambiguous, Rodriguez argues that the Court must construe it in his favor in light of *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839, 846–47, 849 (6th Cir.2000) (quoting *Perez v.*

*Aetna Life Ins. Co.*, 150 F.3d 550, 557 n. 7) (noting in dicta that if an ERISA plan provision is susceptible to more than one reasonable interpretation, the court will construe ambiguities against the drafting party under the rule of *contra proferentem*).

The language of a benefit plan is ambiguous if it is subject to more than one reasonable interpretation. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir.1994). Here, we find no ambiguity since the plain meaning of the contested provision supports only Rodriguez' interpretation. Therefore, we need not decide the applicability of the rule of *contra proferentem*.

General rules of contract interpretation guide us in construing the Fund's plan. *See Hunter*, 220 F.3d at 712. Under such rules, we interpret the disputed plan provision according to its plain meaning. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir.2000).

Restating, the plan provision reads:

*SECTION 3 CONTINUATION OF ELIGIBILITY:*

Once having become eligible, a Covered Employee will continue to be eligible so long as one or more contributing Employers shall have paid on his behalf funds representing at least 130 hours of work for each Contribution Month which corresponds with the respective Benefit Month.

■ The straightforward reading of this contested provision shows the unreasonableness of the Fund's interpretation. Webster's Dictionary defines "representing" as "standing in the place of." Webster's Dictionary 1926 (3d ed.1993). To "represent" something is specifically *not* to require the presence of the thing itself. Therefore, the Fund's interpretation that "representing at least 130 hours of work"

is equivalent to "working at least 130 hours" does not accord the phrase its plain meaning and is therefore unreasonable. Moreover, the Fund's reading of the provision renders the word "representing" superfluous. *See* Restatement (Second) of Contracts § 203(a) (1981) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

The INITIAL ELIGIBILITY section also shows the Fund's interpretation of the provision was not reasonable. In the INITIAL ELIGIBILITY section, the plan clearly requires an employee to work before the employee is eligible for benefits. The plan's INITIAL ELIGIBILITY section reads as follows:

> An employee shall become initially eligible on the first day of the second month following the month in which he has been in the employ of a contributing Employer or Employers and worked at least 260 hours for which contributions are due the Fund during a period not exceeding four (4) consecutive months.

This language stands in stark contrast to the "representing" language found in the CONTINUATION OF ELIGIBILITY section. The INITIAL ELIGIBILITY section unambiguously states that an employee must have worked before benefit eligibility starts. In contrast, the CONTINUATION OF ELIGIBILITY section states that benefits can continue if a contributing employer continues to pay funds "representing" hours of work for the employee. If the plan had intended that a

plan participant must actually work to continue to receive benefits, it could have patterned the CONTINUATION OF ELIGIBILITY section after the language used in the INITIAL ELIGIBILITY section. Yet, the plan chose to diverge from the clear work requirement found in the INITIAL ELIGIBILITY section in its CONTINUATION OF ELIGIBILITY section. We find the Fund's argument unpersuasive that such strikingly different language describes the same work requirement.

The potential implications that arise from the Fund's interpretation of the provision also suggest that the Fund's interpretation is unreasonable. For example, the Fund's interpretation of the provision could conflict with the Federal Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*[1] While this potential conflict is not determinative, it further suggests that the Fund's interpretation is unreasonable. Furthermore, the Fund's interpretation fails to account for vacation, medical, or personal leave. As the district court noted, requiring that an employee work 130 hours in a given month to maintain coverage would result in termination of coverage when an employee took a vacation or medical leave that caused the employee to work less than 130 hours in a month. This result might or might not be illegal. It is, however, not reasonable.

The Fund contends that additional plan provisions support its interpretation of the disputed provision. Specifically, the Fund relies on the INITIAL ELIGIBILITY section, the HOUR BANK section, and the SELF–CONTRIBUTION RULES sec-

---

1. The Fund disputes that Rodriguez was eligible for coverage under the FMLA. We need not decide whether Rodriguez qualified for FMLA protection. Instead, we decide if the Fund's interpretation, an interpretation that would deny coverage to many employees tak-
ing advantage of the FMLA, is reasonable. The discussion of the FMLA merely highlights one of many instances in which the Fund's interpretation could result in an unreasonable elimination of coverage.

tion. The Fund argues that the plan as a whole supports only its interpretation of the contested provision. *See United States Fid. & Guar. Co. v. Ins. Co. of N. Am.*, No. 95–5954, 1998 WL 321054 at *2 (6th Cir. June 2, 1998)(stating that in interpreting a plan provision, the document should be read as a whole). We disagree with the Fund's argument. None of the provisions cited by the Fund convinces us of the reasonableness of the Fund's interpretation of the CONTINUATION OF ELIGIBILITY section. In fact, each section is inapplicable or otherwise supports Rodriguez' interpretation of the disputed provision in equal force.

As previously discussed, the INITIAL ELIGIBILITY section outlines the eligibility requirements for beginning participation in the plan. Although this provision requires a plan participant to have worked before initial coverage begins, the provision does not suggest that a plan participant must work to continue coverage. Moreover, we have already noted that this section supports Rodriguez' interpretation of the debated provision since it clearly shows that the plan knew how to draft a provision requiring work for continued coverage, if that had been the Fund's intent.

The HOUR BANK section allows a plan participant to accumulate excess hours to satisfy the minimum contribution requirement if the participant's employer fails to make the required contribution. This section does not apply in Rodriguez' situation where his employer submitted the necessary contributions to continue Rodriguez' coverage. Furthermore, the HOUR BANK provision demonstrates that an employee can maintain coverage other than by working 130 hours during a contribution month.

The SELF CONTRIBUTION RULES section sets forth a means by which a plan participant continues coverage by contributing the payments necessary for 130 hours. The Fund suggests that this section provides the exclusive way that coverage can continue when a participant fails to work for an employer. However, this section seriously undercuts the Fund's argument that an employee must work 130 hours per month for continued eligibility. As with the situation in Rodriguez' case, the SELF CONTRIBUTION RULES allow coverage to continue although the employee has not worked 130 hours in the previous month. Thus, this section directly contradicts the Plan's proposed interpretation of the disputed provision.

No ambiguity exists in the contested provision. Rodriguez' employer paid contributions to the fund equivalent to the amount paid for a full-time worker. Thus the employer "paid on his behalf funds representing at least 130 hours of work." The plain meaning of the plan language and the document taken as a whole make no requirement that an employee work to continue to receive benefits. For the above reasons, we affirm the district court's finding that Rodriguez was a covered employee at the time he received medical benefits.

### B. "Make Whole" Rule

Even if we find Rodriguez to be a covered employee, the Fund urges us to reverse the district court's determination that the "make whole" rule bars the Fund's claim for subrogation or reimbursement from Rodriguez. The Fund concedes that Rodriguez was not "made whole" by his recovery. However, the Fund argues that the Plan sufficiently disavows application of the "make whole" rule. The Fund seeks subrogation or reimbursement under the following provision:

**Reimbursement/Assignment**

In the event of any payment under this Plan, the Trustees shall be subrogated to all the rights of recovery thereof of either a Covered Employee or a Covered Dependent against any person or entity, and the Covered Employee or Covered Dependent shall execute and deliver instruments and papers and whatsoever else is necessary to secure such rights. Neither the Covered Employee or the Covered Dependent shall do anything after a loss to prejudice such rights, *and common law doctrines such as "make whole" and "common fund" or other similar doctrines shall not be applied to reduce the right of assignment or reimbursement*

If requested in writing by the Trustees, the Covered Employee or Covered Dependent shall take, through any representative designated by the Trustees, such action as may be necessary or appropriate to recover such payment as damages from any person or entity, said action to be taken in the name of the Covered Employee or the Covered Dependent. In the event of a recovery or settlement, the Trustees shall be reimbursed out of such recovery or settlement for expenses, costs and attorneys' fees incurred by them in connection therewith. The right is hereby given the Trustees to receive from any third part(ies), attorneys(s) or insurance compan(ies) an amount equal to the amount paid on behalf of the Covered Employee or Covered Dependent.

The Trustees shall be entitled to the extent of any payment made to a Covered Employee or Covered Dependent, to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of any Covered Employee or Covered Dependent against any person or entity legally responsible for the injury, sickness or condition for which such payment was made.

*While the Plan expects full reimbursement for all benefits paid on behalf of the Covered Persons, there may be occasional circumstances in which full reimbursement is not possible. In such cases, the Plan will expect reimbursement to the extent of the Covered Person's recovery, except that the Covered Person may deduct from this amount and retain any out-of-pocket expenses he or she may have incurred for medical expenses as well as other actual and reasonably incurred losses as may be documented to and reviewed by the Trustees. Any deduction for out-of-pocket medical expenses and other out-of-pocket expenses must be fully documented.*

1999 Plan Document (emphasis added).[4]

On appeal, the Fund states that another source of its right to subrogation or reimbursement comes from the Subrogation Agreement signed by Rodriguez' wife. The Subrogation Agreement provides:

In the event I receive directly the proceeds of any judgment, settlement or

---

4. The Fund adopted the 1999 plan after Rodriguez' accident on April 4, 1999. The prior 1985 plan did not include the italicized language. Rodriguez urges us to use the 1985 plan. The district court, however, based its decision on the 1999 plan. The parties did not address the issue of which plan should govern at the district court level. Neither does the Fund raise the issue in its brief. Consequently, we do not now consider the

issue on appeal. *See United States v. Crozier,* 259 F.3d 503, 517 (6th Cir.2001) (noting that a court generally will not hear issues raised for first time in reply brief); *see also Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1461 (6th Cir.1988) (stating that we will not consider on appeal an issue not discussed by the district court, unless "the issue is presented with sufficient clarity and completeness").

other recovery in connection with a legal claim for damages related to the above claim, I hereby agree that the Fund shall be entitled to such proceeds to the extent that it paid benefits for that claim and that I will pay over to the Fund such amount. I agree that the Fund may recover such amount by offset against future benefits or through any other reasonable and lawful method.

The "make whole" rule of federal common law "provides that an insurer cannot enforce its subrogation rights unless and until the insured has been made whole by any recovery." *Copeland Oaks v. Haupt,* 209 F.3d 811, 813 (6th Cir.2000) (quoting 16 Couch on Insurance 2d § 61:64). In *Copeland Oaks,* this Court held that the "make whole" rule applies to a subrogation clause in an ERISA plan. We allowed, however, for a plan to avoid the application of the "make whole" rule by including language conclusively disavowing the rule's application to the plan. Specifically, we required that the plan be "clear in establishing both a priority to the funds recovered and a right to any full or partial recovery." *Id.*[5] We later made clear that the "make whole" rule applies to reimbursement as well as subrogation clauses. *Hiney Printing Co. v. Brantner,* 243 F.3d 956 (6th Cir.2001).

■ The Fund's subrogation agreement signed on behalf of Rodriguez does not properly disavow the "make whole" rule. The agreement does not establish who has priority to any recovered amounts nor whether the Fund has a right to full or partial recovery. Under *Copeland Oaks* and *Hiney,* this agreement gives the Fund

no basis for asserting its right to reimbursement or subrogation against Rodriguez.

■ Neither does the 1999 Plan conclusively disavow the default rule of *Copeland Oaks.* The Fund argues that the 1999 Plan language negating application of the "make whole" rule meets the disavowal requirements of *Copeland Oaks* and *Hiney.* Although the 1999 Plan states that the "make whole" doctrine does not apply, the 1999 Plan does not establish who has priority to any recovered funds or whether the Plan has a right to full or partial recovery. *See Copeland Oaks,* 209 at 813. Absent such language, the 1999 Plan has not sufficiently disavowed the "make whole" doctrine.

The 1999 Summary Plan Description also fails to disavow the "make whole" rule. The 1999 Summary Plan Description reads:

**Subrogation**

In the event of any payment under this Plan, the Trustees shall be subrogated to all the rights of recovery thereof of either a Covered Employee or a Covered Dependent against any person or entity, and the Covered Employee or Covered Dependent shall execute and deliver instruments and papers and whatsoever else is necessary to secure such rights. Neither the Covered Employee or the Covered Dependent shall do anything after a loss to prejudice such rights.

If requested in writing by the Trustees, the Covered Employee or Covered Dependent shall take, through any repre-

---

**5.** Hence, we now hold that in order for plan language to conclusively disavow the default rule, it must be specific and clear in establishing both a priority to the funds recovered and a right to any full or partial recovery. In the absence of such clear and specific language

rejecting the make-whole rule—with clarity and specificity ultimately determined by the reviewing court—it is arbitrary and capricious for a plan administrator not to apply the default.

*Copeland Oaks,* 209 F.3d at 813

sentative designated by the Trustees, such action as may be necessary or appropriate to recover such payment as damages from any person or entity, said action to be taken in the name of the Covered Employee or the Covered Dependent. In the event of a recovery or settlement, the Trustees shall be reimbursed out of such recovery or settlement for expenses, costs and attorneys' fees incurred by them in connection therewith. The right is hereby given the Trustees to receive from any third part(ies), attorneys(s) or insurance compan(ies) an amount equal to the amount paid on behalf of the Covered Employee or Covered Dependent.

The Trustees shall be entitled to the extent of any payment made to a Covered Employee or Covered Dependent, to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of any Covered Employee or Covered Dependent against any person or entity legally responsible for the injury, sickness or condition for which such payment was made.

1999 Summary Plan Description.

Like the 1999 Plan, the 1999 Summary Plan Description fails to establish who has priority to the funds or the Fund's right to any full or partial recovery as required by *Copeland Oaks*. Thus, the 1999 Summary Plan Description does not satisfactorily disavow application of the "make whole" rule.[6]

Because the Subrogation Agreement, the 1999 Plan, and the 1999 Summary Plan Description do not satisfactorily disavow the "make whole" rule under *Copeland* and *Hiney*, the district court properly found that the "make whole" doctrine barred the Fund from seeking any subrogation or reimbursement from Rodriguez. We affirm the district court's decision on this point.

## C. Motion for Reconsideration

The Fund also complains that the district court erred in denying its motion for reconsideration of an interlocutory order. In support of the district court's authority to hear such motions, the Fund points to Federal Rule of Civil Procedure 54(b). The Fund suggests that a district court may deny such a motion only if the movant filed it in bad faith as defined by Federal Rule of Civil Procedure 11(b)(1)-(4). The Fund asks this Court to hold that the district court erroneously analyzed the issue by considering factors that are normally considered when a party seeks relief from a final judgment.

In its motion for reconsideration, the Fund urged the district court to consider as evidence Skilton's collective bargaining agreement. The Fund contended that the bargaining agreement clarified that the plan language required Rodriguez to work

---

6. Plaintiff Rodriguez argues that even if the 1999 Plan disavowed the "make whole" doctrine, the Court should hold that the summary plan description is binding over the plan itself. For support, Plaintiff relies on *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988). This was, in fact, the rationale for the district court's decision on the applicability of the "make whole" rule. This Circuit has, however, expressly refused to extend *Edwards* to omissions of details:

> The principle announced in *Edwards* does not apply to silence. An omission from the summary plan description does not, by negative implication, alter the terms of the plan itself. The reason is obvious: by definition, a summary will not include every detail of the thing it summarizes. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998) *(en banc)* (citations omitted).

Because we find that the 1999 Plan fails to disavow the "make whole" rule, we need not decide whether the omission of the 1999 plan language from the 1999 summary plan description is the sort of silence which results in application of *Sprague*.

130 hours per month to remain eligible for medical benefits. The Fund further argued that the district court should not have relief on the potential illegality of the plan provision under the FMLA because it was an "illusory" illegality.

Concluding that the collective bargaining agreement had been in existence at the time of the earlier order and could have been introduced into to the record at that time, the district court found no reason for subsequently considering the agreement. In addressing the Fund's FMLA argument, the district court noted that the Fund misconstrued its reasoning. Even if the district court accepted the Fund's FMLA argument, the district court noted that its findings would remain the same. The district court then denied the Fund's motion for reconsideration.

The Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders. Because of this, some circuits have suggested that a district court's power to reconsider an order before final judgment exists under federal common law, not the Federal Rules of Civil Procedure. *See, e.g., City of Los Angeles v. Santa Monica Baykeeper,* 254 F.3d 882, 886 (9th Cir.2001). Although we agree that the authority for hearing such motions has a common law basis, we find additional support in Federal Rule of Civil Procedure 54(b). *See Fayetteville v. Commercial Builders, Inc.,* 936 F.2d 1462, 1469–70 (4th Cir.1991) (approving of Rule 54(b) as a proper procedural vehicle for bringing motions to reconsider interlocutory orders).

District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment. *See Mallory,* 922 F.2d at 1282. This authority allows district courts "to afford such relief from [interlocutory orders] as justice requires." *Citibank N.A. v. Fed. Deposit Ins. Corp.,* 857 F.Supp. 976, 981 (D.D.C.1994); *see also Melancon v. Texaco, Inc.,* 659 F.2d 551, 553 (5th Cir.1981). Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice. *Reich v. Hall Holding Co.,* 990 F.Supp. 955, 965 (N.D.Ohio 1998).[7]

Here, the district court set forth general guidelines to help determine whether justice required that it reconsider its interlocutory order.[8] Since the Fund had the evidence at the time of the court's earlier decision, the district court's refusal to consider this evidence is not clearly unjust. Further, justice does not require that the district court allow the Fund an opportunity to make a legal argument on an issue that would not alter the district court's

---

**7.** This standard obviously vests significant discretion in district courts. However, this and not Rule 11 is the standard governing requests for reconsideration of interlocutory orders. A movant has no right to reconsideration of an interlocutory order simply because the movant makes the motion in good faith.

**8.** The district court stated that it "generally will consider motions for reconsideration pursuant to the grounds available for motions to alter or amend under Rule 59(e) or upon a showing that the court clearly overlooked material facts or controlling law that was presented by the party in its prior motion and that would result in a different disposition." *See Al–Sadoon v. FISI*Madison Fin. Corp.,* 188 F.Supp.2d 899, 902 (M.D.Tenn.2002). We do not interpret this language as stating that motions for reconsideration of interlocutory orders are governed by the standards of either Rule 59 or Rule 60. The district court merely appeared to give litigants guidance on when it would generally find that justice required the granting of a motion for reconsideration.

prior decision. Therefore, we find no abuse of discretion in the district court's order denying the motion for reconsideration of the interlocutory order.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court on all issues raised for appeal by the Appellant–Defendant.