NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0376n.06

No. 20-3608

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 04, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NOVIA COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| JESSE WEATHERBY; COMMUNITY | ) | OHIO |
| BROADCAST GROUP, INC., | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| ORION MEDIA MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Novia Communications, LLC, contracted to buy a television station from Community Broadcast Group, Inc, a company that goes by "CBG." Before closing, CBG rescinded the deal. Novia sued for breach of contract and alternatively argued that the doctrine of "equitable estoppel" should prevent CBG from terminating the agreement under New York law. Yet the parties' agreement unambiguously gave CBG the termination right it exercised. And Novia has not made the demanding showing required to sidestep the contract's terms with its calls to equity. As Judge Learned Hand long ago explained, "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect

themselves" through the contract. *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir. 1933). We thus affirm the district court's grant of summary judgment to CBG.

I

On October 1, 2014, Novia entered into an Asset Purchase Agreement (Purchase Agreement) with CBG to pay $400,000 for the assets of Channel 48, a local television station in Toledo, Ohio. The Purchase Agreement required the parties to apply with the Federal Communications Commission (FCC) for its consent to the transfer of the station's broadcast license to Novia. The agreement conditioned the sale on the FCC's consent and required the closing to occur within ten days of that consent. It also granted either party a right to terminate the deal if the closing did not happen within 270 days unless the terminating party's failure to fulfill a material obligation under the agreement had caused the delay.

The parties quickly applied for the license transfer with the FCC. According to Novia, FCC consent for such a transfer typically takes about 60 days. But the parties soon hit a snag. CBG's minority shareholders petitioned the FCC to deny the application. Two minority shareholders then sued Novia, CBG, and CBG's majority shareholder, Jesse Weatherby. Their suit alleged that the Purchase Agreement had underpriced the station's assets because the FCC was about to hold a reverse spectrum auction, which allegedly increased the value of the station's license.

The FCC sat on the parties' application. By March 2015, Novia and CBG had agreed to a separate Local Marketing Agreement (Marketing Agreement) for the station's operations in the meantime. CBG would continue to run the station for a monthly fee, but Novia would provide the programming and advertising and collect the revenue.

In June 2015, 270 days passed since the Purchase Agreement. Each side thus gained the right to terminate the agreement from then on. Neither party invoked the right at that time. Yet the shareholders' suit remained pending, and the FCC had still not consented to the transfer. According to Novia's president, Weatherby (CBG's majority shareholder) repeatedly assured him that CBG intended to close once the FCC consented.

In late 2015, Novia negotiated a settlement with the minority shareholders that released their claims against it. CBG and Weatherby were not parties to this settlement, but they asked Novia to add a term to its release agreement requiring the shareholders to surrender their stake in CBG. In December 2015, the shareholders agreed to that term in a release with Novia. The shareholders also agreed to a stipulated dismissal that dismissed their suit with prejudice against all parties, including CBG and Weatherby. The shareholders' counsel later alleged that he had wrongly dismissed the claims against CBG and Weatherby *with* prejudice because they were not parties to the release. He moved to make the dismissal *without* prejudice. The court found that this claimed mistake did not justify reopening the judgment. We affirmed. *A Renewed Mind v. Weatherby*, 675 F. App'x 572, 573–75 (6th Cir. 2017).

Novia believed that this settlement paved the way for the closing even though the FCC still had not consented to the license transfer. CBG thought differently. On the day that the parties dismissed the suit, it exercised its right to terminate the deal. Weatherby asserted that CBG decided to end the deal at this time because the deadline to enter the FCC auction was looming and CBG worried about its ability to do so if the station owner remained uncertain.

Unhappy with the sale's late-in-the-day collapse, Novia brought this diversity suit against CBG, Weatherby, and a third entity called Orion Media Management, LLC. Novia alleged, among

3

other claims, that CBG had breached the Purchase Agreement, that CBG and Orion had breached separate promissory notes, and that CBG and Weatherby had committed various torts.

Both sides moved for partial summary judgment on Novia's contract claim. The district court agreed with CBG's reading of the Purchase Agreement and held that CBG had the right to terminate the deal. Yet the court then invoked "equitable estoppel," which it interpreted as barring parties from waiting too long to exercise their contract rights. Here, the court held, CBG waited too long to exercise its termination right because Novia had agreed to the Marketing Agreement and settled the lawsuit in the interim.

On CBG's motion for reconsideration, the district court reversed its estoppel decision. For estoppel to apply, the court explained, CBG must have had a "duty to speak" about its reservation of the termination right. The court could find no such duty simply because the parties had entered into the Marketing Agreement. It thus granted summary judgment to CBG on Novia's contract claim.

After this ruling, the court entered a consent judgment at the parties' request. It found for Novia in specific dollar amounts on the promissory-note claims, dismissed Novia's tort claims without prejudice, and certified Novia's contract claim for immediate appeal under Federal Rule of Civil Procedure 54(b).

Novia appealed. We dismissed for lack of appellate jurisdiction. The appeal did not arise from a final judgment because of the without-prejudice dismissal of Novia's tort claims. *Novia Commc'ns, LLC v. Weatherby*, 798 F. App'x 890, 892 (6th Cir. 2020). And the Rule 54(b) certification could not justify an early appeal because the district court gave no reasons why such an appeal made sense. *Id.* at 892–93. Novia also had not properly established diversity jurisdiction

under 28 U.S.C. § 1332 because it was a limited liability company that took the citizenship of its members but had not identified any of those members. *Id.* at 893–94.

On remand, Novia cured its defective jurisdictional allegations. The district court entered a final judgment by dismissing Novia's remaining claims with prejudice. With our jurisdiction now secure, Novia again appeals the district court's grant of summary judgment on its contract claim. It argues that CBG breached the Purchase Agreement by terminating the sale and that equitable estoppel barred CBG from exercising this termination right six months after it vested. We address each argument in turn, reviewing the district court's decision de novo. *See Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

## II. Breach of Contract

The parties agree that New York law applies because the Purchase Agreement contains a forum-selection clause choosing that law. *Cf. Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019). Under New York contract law (as under the contract law in most states), a court must enforce the plain terms of an unambiguous contract. *See Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). We thus may resolve a dispute about an unambiguous contract at this summary-judgment stage. *Id.* And here, the unambiguous terms of the Purchase Agreement allowed CBG to terminate the agreement in December 2015.

### A

Section 12.1 listed the ways in which one or both parties could terminate the Purchase Agreement. Section 12.1(b) stated that a party could terminate it after 270 days so long as that party's failure to fulfill an obligation had not caused the delay in closing:

> This agreement may be terminated at any time prior to Closing . . . by Seller or Buyer if the Closing shall not have occurred on or before 270 days following the date of this Agreement; provided, however, that the right to terminate this Agreement under this Section 12.1(b) shall not apply to any party whose failure to

fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the closing to occur prior to such date[.]

Agreement, R.16-2, PageID 221. The parties agree that this section created a right to terminate after 270 days. And they agree that the 270-day period had run. They part ways only over whether CBG's "failure to fulfill" a "material obligation" was the "cause of" the failure to close.

Novia claims that CBG failed to "fulfill" three "obligations." Two "obligations" on which Novia relies (in Sections 4.6 and 4.11) were in the agreement's Article 4. In that article, CBG issued a series of "representations and warranties." Section 4.6 warranted that the "Seller has good, valid and marketable title to all of the Station Assets, and such title will be delivered free and clear of all Liens at the Closing." *Id.*, PageID 212. Section 4.11 warranted that:

> Seller is not subject to any order, writ, injunction, judgment, arbitration decision or decree having binding effect and affecting the Station or the Station Assets or which restrains or enjoins the transactions contemplated hereby, and no such proceeding is pending. There is no material litigation pending by or against, or to the best of Seller's knowledge, threatened against Seller which relates to the Station or could affect any of the Station Assets.

*Id.*, PageID 214. The third "obligation" on which Novia relies (in Section 9.5) was in Article 9. This article made Novia's own obligations under the agreement "subject to the fulfillment of" certain "conditions prior to or on the Closing Date[.]" *Id.*, PageID 217. Section 9.5 conditioned Novia's obligations on the following: "There shall not be any Liens on the Station Assets (other than Permitted Liens) or any financing statements of record with respect to the Station Assets except those to be released at the Closing." *Id.*, PageID 218.

Novia claims that the CBG shareholders' lawsuit and FCC petition violated the two warranties in Sections 4.6 and 4.11 and the condition in Section 9.5 because those filings qualified as pending "litigation" or "liens." Yet Novia's reliance on these three sections fails for an unambiguous reason: timing. The text of the three sections (in contrast to the text of nearby

sections) shows that they made commitments about the state of the world at two discrete dates: the date of the agreement and the date of closing. The shareholders' suit and FCC petition existed at neither time because they arose after the agreement date and because the closing never occurred.

We begin with each section's text. Start with Section 4.6. It issued a warranty about the facts that existed as of the date of the Purchase Agreement and a warranty about the facts that would exist at a concrete future date. The section warranted that CBG "has" (in the present tense) "good, valid and marketable title to all of the Station Assets." *Id.*, PageID 212. Novia has not claimed that CBG lacked valid title on the agreement date. It instead relies on the second forward-looking warranty: that the "title will be delivered free and clear of all Liens *at the Closing*." *Id.* (emphasis added). According to Novia, the shareholders' suit and FCC petition were "liens" under the agreement's broad definition of that term (any claim or encumbrance on the station assets). Yet even if these filings were "liens" (CBG disputes the point), this warranty did not pledge that CBG's title would be free of liens every day in between the agreement date and the closing date. It promised only to deliver a lien-free title "at the Closing." CBG thus could not have failed to fulfill this date-specific obligation because the closing never took place.

Turn to Section 4.11. In this section, CBG again issued a warranty about the facts that existed as of the date of the Purchase Agreement. It warranted that, on that date, there "is" (in the present tense) "no material litigation pending" or "threatened" against CBG relating to the station. *Id.*, PageID 214. That warranty was true. The minority shareholders did not file their suit until three months later. And Novia has identified no evidence suggesting that the shareholders had threatened CBG with this suit on or before the agreement date.

End with Section 9.5. It gave Novia the right to avoid its contract obligations if there were "any Liens on the Station Assets[.]" *Id.*, PageID 218. But Article 9 of the Purchase Agreement

allowed CBG to meet this condition "prior to *or* on the Closing Date." *Id.*, PageID 217 (emphasis added). So again, CBG could violate this no-lien duty only if liens existed at the closing. Because the closing never happened, CBG did not fail to fulfill the duty.

The "context of the entire agreement" confirms this reading. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 643 (N.Y. 1990)). Other sections show that the warranties in Sections 4.6 and 4.11 and the condition in Section 9.5 applied at discrete points—either when made or at closing. Another condition in Article 9 made this point expressly. Section 9.1(a) told the parties that CBG's "representations and warranties" (including those in Sections 4.6 and 4.11) must "have been true and correct in all material respects *as of the date* when made and shall be deemed to be made again on and *as of the Closing Date* and shall then be true and correct in all material respects." Agreement, R.16-2, PageID 217 (emphases added). This provision shows that CBG's initial representations were made on a discrete date—the date of the Purchase Agreement. Indeed, Section 9.1(a) would serve no purpose under Novia's view that those representations were made (and had to remain true) on each and every day of the entire "executory period"—from the agreement date through the closing date.

When, by contrast, the parties intended to impose this type of ongoing duty during the entire executory period, they did so in clear language. In Article 6, for example, CBG issued a series of covenants that it must follow "*from the date hereof until the completion of the Closing*." *Id.*, PageID 215 (emphasis added). Section 6.1 obliged CBG to "operate the Station consistent with past practice." *Id.* Even more notably, Section 6.1 indicated that CBG "shall not, by any act or omission, knowingly cause any of the representations and warranties" in Article 4 "to become untrue or incorrect in any material respect," and it required CBG to "use commercially reasonable

efforts to cause the conditions" identified in another article to be met. *Id.* Likewise, Section 6.2 stated that CBG must notify Novia "promptly upon learning of the occurrence of any event . . . that would have caused a material breach" of CBG's representations "had such event occurred or been known to [CBG] prior to" the date of the Purchase Agreement. *Id.*

Novia makes no claim that CBG violated these continuing duties. Novia, for example, does not claim that CBG knowingly caused its minority shareholders to sue in violation of Section 6.1. And Novia does not claim that CBG failed to give Novia notice of that suit in violation of Section 6.2. Novia instead seeks to transform Sections 4.6, 4.11, and 9.5 into similar continuous duties because it cannot rely on the agreement's specific provisions imposing those duties. By doing so, Novia would render these other provisions superfluous in violation of basic contract principles. *Sayers*, 7 F.3d at 1095; *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). Why bar CBG from *knowingly* causing its representations to become untrue after the agreement date if Sections 4.6 and 4.11 already made CBG *strictly liable* for any post-agreement event that rendered those representations untrue?

All told, the text of Sections 4.6, 4.11, and 9.5 as well as surrounding provisions show that those three sections made representations or imposed a condition on discrete dates. Because CBG did not violate the representations or the condition on those dates, it did not fail to fulfill its obligations under the agreement. That fact, in turn, allowed it to exercise its termination right.

B

Novia's responses fail to persuade us otherwise. *First*, Novia begins with the agreement's text. Novia's brief offers no reading of the language in Sections 4.6, 4.11, or 9.5 that would turn them into continuing duties. It instead relies on other provisions for its claim that these three sections should be read in that atextual way. Novia initially alleges that Section 9.1(a) required

CBG's representations in Article 4 "to be true not only as of the Effective Date of the Agreement, *but up to and including the Closing Date*[.]" Appellant's Br. 13. Its brief misstates Section 9.1(a)'s text. That section says that these representations are made at two distinct points (on the agreement date and the closing date), *not* including the entire period in between.

Novia next cites the covenants in Article 6, which did apply between the agreement and closing dates. Section 6.2 required CBG to notify Novia of any event that either (1) "would cause or constitute a material breach" of its warranties in Article 4 or (2) "would have caused a material breach [of those warranties] had such event occurred or been known to [CBG] prior to" the agreement date. Agreement, R.16-2, PageID 215. If CBG's warranties only concerned the facts existing as of the agreement date, Novia asks, when could a post-agreement event "cause or constitute a material breach" of those warranties under the first of these clauses? The answer: some of CBG's warranties were future-looking, such as CBG's warranty that it would deliver good title at closing. If CBG took an action that categorically prohibited it from being able to deliver good title at closing, it could breach this future-looking guarantee. In fact, it is Novia's interpretation that renders one of these clauses a nullity: Why would the parties add Section 6.2's second clause (about an event hypothetically occurring as of the agreement date) if all of Article 4's warranties already covered any event that occurred after that date?

Novia also looks to Section 9.6. It imposes the following condition on Novia's contractual obligations: "Since the date of this Agreement, there shall have not occurred a Material Adverse Effect" (defined as an event that could negatively affect the station). *Id.*, PageID 218. Section 9.6's use of "[s]ince the date of this Agreement," according to Novia, shows that the representations and conditions in sections other than Section 9.6 apply throughout the entire executory period too. The opposite is true. Section 9.6 reiterates that the parties knew how to

impose continuing obligations when they wanted to. The parties did so in Section 9.6. But they did not do so in the sections on which Novia relies for its claimed breach.

*Second*, Novia turns to precedent. It argues that *Project Gamma Acquisition Corp. v. PPG Industries, Inc.*, 934 N.Y.S.2d 671 (Sup. Ct. 2011), interpreted a warranty in a similar agreement to apply *continuously* between the agreement and closing dates. Not so. The court found a breach of that warranty on a *date-certain* closing. The seller had agreed to sell its glass business to the buyer in September 2007 and represented that no customer had threatened to reduce its glass purchases. *Id.* at 672–73. The agreement included a term (like Section 9.1(a) here) stating that the seller's "representations and warranties . . . shall be true and correct in all material respects . . . when made and at and as of the Closing[.]" *Id.* at 673–74 (emphasis omitted). The agreement also stated that the closing would occur by December 31 and allowed either side to terminate if it had not. *Id.* at 674–75. In between the September agreement and December closing, a customer threatened to reduce purchases. *Id.* The buyer terminated the agreement and sued the seller for breaching the warranty based on that threat. *Id.* The court found a breach, reasoning that the seller had warranted that, "as of the Closing, which would be no later than December 31, 2007 absent written agreement, [the seller] would not have received a writing by [a customer] expressing a threat or intention to reduce" its purchases. *Id.* at 675. Yet the customer had not "rescinded its threat as of December 31, 2007, the outside Closing Date," so the court found a breach based on the facts that existed on that date. *Id.* Here, by contrast, the Purchase Agreement identifies no similarly concrete closing date (except perhaps ten days after the FCC's final consent). That is why Novia is forced to argue that CBG's warranties covered the entire executory period.

*Third*, Novia turns to policy. Novia suggests that our reading of the agreement renders it "commercially nonsensical" because the reading would have forced Novia to close even if CBG's

warranties about the station became false in between the agreement and closing dates. Novia is mistaken. If a post-agreement event would have caused CBG's pre-agreement warranties to no longer be true, CBG agreed to *notify* Novia. And the agreement left Novia in the driver's seat from then on. If Novia thought that this event had a "material adverse effect" on the station, Section 9.6 allowed it to avoid its obligations. Agreement, R.16-2, PageID 218. And a separate termination provision in Section 12.1 allowed it to terminate the deal if that event would also prohibit Section 9.6's no-adverse-event condition from being met. *Id.*, PageID 221.

*Fourth*, and finally, Novia argues that CBG cannot benefit from its own breach under New York law. Maybe so. But CBG did not breach. So we must enforce the Purchase Agreement's terms as written. They unambiguously confirm the district court's decision.

### III. Equitable Estoppel

Novia also argues that even if CBG properly terminated the Purchase Agreement under the agreement's terms, it should be estopped from doing so six months after the termination right vested. Novia cannot establish the elements of equitable estoppel under New York law.

Equitable estoppel has deep roots in New York's common law of contracts. The doctrine arose from situations in which a contracting party told the other side that it need not comply with a contract provision but then reneged by attempting to use the other side's resulting noncompliance against it. *See Imperator Realty Co. v. Tull*, 127 N.E. 263, 264–65 (N.Y. 1920); *Thomson v. Poor*, 42 N.E. 13, 14–15 (N.Y. 1895). Suppose, for example, that a contract for the sale of property noted that the seller must get the property into compliance with local building codes before closing, but the purchaser stated that the seller could simply provide the funds needed for compliance at closing. *See Imperator Realty*, 127 N.E. at 263–64. If the purchaser then refused to proceed with the deal on the ground that the seller had breached the contract by not getting the property into

compliance, equitable estoppel would bar the purchaser from "tak[ing] advantage of an omission induced by his unrevoked consent." *Id.* at 265; *see id.* at 266–67 (Cardozo, J., concurring).

Courts applying this equitable doctrine must balance competing concerns. The doctrine has *after-the-contract* benefits by allowing courts to prevent inequities arising from the parties' course of performance. "It is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269 (N.Y. 1982). Yet the doctrine has *before-the-contract* costs—namely, transaction costs. If courts haphazardly invoke the doctrine, it creates uncertainty for transacting parties over whether (and when) courts will enforce their contract terms. That uncertainty could stop beneficial exchanges. After all, "[u]nless pacts are enforced according to their terms, the institution of contract, with all the advantages private negotiation and agreement brings, is jeopardized." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). New York courts have thus hesitated before using equitable doctrines that would "rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous." *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 618 N.Y.S.2d 99, 100 (App. Div. 1994); *see Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 91 (2d Cir. 2013); *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir. 1933) (Hand, J.).

To strike the proper balance, courts have stated that "[t]he doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances." *Mahuson v. Ventraq, Inc.*, 988 N.Y.S.2d 309, 311 (App. Div. 2014) (quoting *Townley v. Emerson Elec. Co.*, 702 N.Y.S.2d 728, 729 (App. Div. 2000)). Generally, the party to be estopped must have knowingly made a

statement or engaged in conduct that amounts to a false representation (or concealment of material fact) with intent that the other side would rely on the statement or conduct. And the party invoking estoppel must have, in fact, detrimentally relied. *See Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (App. Div. 1980); 57 N.Y. Jur. 2d Estoppel §§ 8, 35, Westlaw (updated Nov. 2020); *cf. Gaia House*, 720 F.3d at 90.

Specifically in this contract setting, contracting parties often seek to use estoppel to prevent the other side from invoking a contract right based on that side's *conduct* (not its *statements*) during the course of performance. When a party argues that the other side's conduct impliedly "represented" that it would not invoke a contract right, not just any conduct will do. Rather, the New York courts have adopted a clear rule to govern this type of claim: The other side's conduct must be *plainly incompatible* with the contract's terms and so signal its intent to depart from those terms. *See* 57 N.Y. Jur. 2d Estoppel § 16; *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283–84 (N.Y. 1977). If, by contrast, the other side's conduct is "compatible with the agreement as written," the conduct cannot establish estoppel because it provides no basis to infer that the party intends to disavow a contract right. 57 N.Y. Jur. 2d Estoppel § 16; *see Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990); *Town of Hempstead v. Incorporated Village of Freeport*, 790 N.Y.S.2d 518, 520 (App. Div. 2005); *Ford Motor Credit Co. v. Sawdey*, 730 N.Y.S.2d 611, 612 (App. Div. 2001). This clear equitable-estoppel rule—that a party's conduct must be incompatible with the contract as written—permits the contracting parties to predictably order their affairs during the contractual relationship without worrying that a court will later conclude that the party has forfeited reliance on a contract right.

Two examples illustrate the scope of the rule. *Compare 335 Second St. Hous. Corp. v. Fridal Enters., Inc.*, 830 N.Y.S.2d 173, 173–74 (App. Div. 2007), *with Flushing Unique Homes,*

*LLC v. Brooklyn Fed. Sav. Bank*, 954 N.Y.S.2d 606, 609 (App. Div. 2012). In *335 Second Street*, the court held that estoppel applied when a lender had long charged a borrower a low interest rate because this charged rate conflicted with the one authorized by the contract. 830 N.Y.S.2d at 173–74; *cf. First Union Nat'l Bank v. Tecklenburg*, 769 N.Y.S.2d 573, 576–77 (App. Div. 2003). In *Flushing*, by contrast, the court held that estoppel did not apply when a lender belatedly exercised a contractual right to demand full repayment because the delayed request for that repayment comported with the contract as written. 954 N.Y.S.2d at 609; *cf. Towers*, 894 F.2d at 522.

This rule dooms Novia's estoppel claim here. Novia does not argue that anyone at CBG made false *statements* about CBG's intent to terminate the contract. Although Novia's president averred that Weatherby told him that CBG intended to close, the president did not offer specific dates for Weatherby's statements (other than that they came before CBG's termination). And Weatherby testified that CBG did intend to close through December 2015. Novia instead relies on CBG's *conduct* to justify estoppel. Novia focuses on two CBG actions: (1) its acceptance of Novia's payments under the Marketing Agreement and (2) its acquiescence to Novia's settling of the minority shareholders' suit. These actions, according to Novia, impliedly signaled that CBG would not later assert its termination right. But Novia's claim fails because "[n]one of the . . . conduct attributed to [CBG] was inconsistent with its rights under the agreements as written." *Towers*, 894 F.2d at 522; *see Flushing*, 954 N.Y.S.2d at 609.

To begin with, CBG's acceptance of payments under the Marketing Agreement did not conflict with its termination right. The Marketing Agreement was a separate contract arising from separate consideration. Novia agreed to pay CBG a monthly fee. In return, Novia received programming rights, advertising revenues, and CBG's day-to-day operation of the station. Benefits and burdens flowed both ways. And although the Marketing Agreement referenced the

Purchase Agreement, it did not eliminate the parties' rights under the Purchase Agreement. That includes the right to terminate that agreement after 270 days. In fact, Novia nowhere suggests that the Marketing Agreement's plain language abrogated the parties' right to terminate. It instead asks us to add that term after the fact. But equitable estoppel does not permit us to "rewrite the agreement to relieve" Novia of terms it now regrets. *John Doris*, 618 N.Y.S.2d at 100; *Gaia House*, 720 F.3d at 91. Because CBG's performance under the Marketing Agreement (including its acceptance of payments) was "compatible with" its retention of a termination right under the Purchase Agreement, estoppel cannot arise from this conduct. *Flushing*, 954 N.Y.S.2d at 609.

Likewise, CBG's acquiescence to Novia's settlement of the shareholders' suit did not conflict with its termination right. Novia negotiated a settlement with the minority shareholders in which they gave up their stake in CBG and released their claims against Novia for undisclosed consideration. And (accidentally or not) these minority shareholders stipulated to a dismissal of the suit against all parties, including CBG and Weatherby. Novia again fails to identify anything in this course of conduct that conflicts with CBG's retention of its termination right. The release agreement, for example, nowhere includes a provision eliminating that right (and did not include CBG as a party in any event). The dismissal likewise contained no concession that CBG was giving up its termination right as a condition of dismissal. Instead, Novia asks us to add such a term to these items. But equitable estoppel does not allow us to do so because CBG's alleged acceptance of Novia's settlement efforts was again "compatible with" its ability to later invoke its termination right. *Id.* (Indeed, Novia retained the same termination right and could have ended the deal if its business outlook changed in a way that made the deal unprofitable.)

Novia's responses do not change things. It initially relies on irrelevant caselaw. New York courts often base estoppel on "the acceptance and retention by one having knowledge or notice of

the facts, of benefits derived from a transaction, contract, instrument, regulation, or statute, that such party might have rejected or contested." 57 N.Y. Jur. 2d Estoppel § 23. This "acceptance-of-benefits" principle often arises when a contract term is ambiguous. *See, e.g.*, *Savasta v. 470 Assocs.*, 579 N.Y.S.2d 167, 169 (App. Div. 1992). In that setting, a party cannot accept the benefits associated with one reading of the ambiguous term but argue for the opposite reading when attempting to avoid the burdens associated with its initial interpretation. *See id.*; *cf. R.A.C. Holding, Inc. v. City of Syracuse*, 684 N.Y.S.2d 740, 741 (App. Div. 1999). This law has no relevance here. CBG has kept to the same interpretation of the relevant contract terms throughout: The Marketing Agreement's payments were for separate consideration and both sides retained their termination rights during the course of their dealings.

This "acceptance-of-benefits" principle also often arises after a party's breach. If the nonbreaching party continues to accept the contract's benefits after that breach, the nonbreaching party cannot later invoke an absolute right to terminate the contract based on the breach. *See, e.g.*, *ESPN, Inc. v. Off. of Comm'r of Baseball*, 76 F. Supp. 2d 383, 391–92 (S.D.N.Y. 1999). This law also has no relevance here. CBG did not invoke a right to terminate the Purchase Agreement based on Novia's breach. It invoked the right based on the agreement's plain terms.

Novia next relies on irrelevant factual claims. It suggests that the Marketing Agreement was premised on the parties' anticipation that the asset sale would close. Perhaps so. But the Marketing Agreement did nothing to abrogate the Purchase Agreement's termination right. That fact bars Novia's reliance on this agreement. As a matter of contract law, we must enforce the contract's expressed terms, not the parties' unexpressed hopes. As a matter of estoppel law, CBG's conduct was fully consistent with its adherence to the contract terms, which bars Novia's claim to estoppel based on its conduct. *Flushing*, 954 N.Y.S.2d at 609. In all events, Novia's own conduct

rebuts its claim that performance under the Marketing Agreement hinged on the expectation that the asset sale would close. For months after CBG exercised its termination right and Novia knew that the sale would not close, Novia continued to participate in the Marketing Agreement despite its ability to end it.

Novia also implies that CBG intended to terminate the Purchase Agreement for the entire six months it had the right to do so. Whether or not this allegation is true, Novia's claim lacks merit for a separate reason: Novia "failed to establish that the conduct upon which [it] relied to establish the estoppel was 'incompatible with the agreement as written, a requisite for applying equitable estoppel'" under New York law. *Ford Motor Credit Co.*, 730 N.Y.S.2d at 612 (citation omitted). Regardless, Novia offers no proof for its allegation. And CBG's undisputed testimony shows the opposite: Weatherby swore that CBG decided to terminate only in December because of the approaching FCC auction.

Lastly, Novia argues that even if the district court could have rejected its equitable-estoppel argument as an initial matter, the court wrongly did so through CBG's motion for reconsideration. Yet the Federal Rules of Civil Procedure make clear that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). So "a district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case." *In re Life Invs. Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) (citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)). The rules generally permit district judges, no less than Supreme Court Justices, to follow Justice Jackson's astute advice: "I see no reason why I should be consciously wrong today because I was unconsciously wrong yesterday." *Massachusetts v. United States*, 333 U.S. 611, 639–40 (1948) (Jackson, J., dissenting). And Novia identifies no

prejudice from the way in which the court resolved this claim. The court thus did not commit procedural error by reconsidering its earlier estoppel ruling.

At day's end, we would not "promote justice" if we retroactively revised the parties' agreement to eliminate CBG's termination right simply because Novia (a sophisticated business) did "not protect" itself by adding such a term to an agreement during the parties' extended negotiations. *See James Baird*, 64 F.2d at 346. By enforcing contract terms except in rare circumstances, New York law adopts a clear rule for future transacting parties over how they may protect themselves: negotiate over the desired term and include it in the contract.

We affirm.

**HELENE N. WHITE, Circuit Judge,** concurring in part and dissenting in part.

I join the majority's opinion except as to the equitable estoppel claim. I would hold that issues of fact preclude summary judgment on the question whether CBG and Weatherby were estopped from terminating the Asset Purchase Agreement.

"The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." *Shondel J. v. Mark D.*, 853 N.E.2d 610, 613 (N.Y. 2006). Here, the Asset Purchase Agreement provided that either party could terminate the agreement 270 days after execution, which was June 28, 2015. After that right accrued, Weatherby watched as Novia spent months negotiating a settlement with the minority shareholders—a settlement of great value to Weatherby and of no value to Novia should Weatherby terminate the Asset Purchase Agreement—without offering Novia a hint that he was going to terminate the sale on Christmas Eve, mere minutes after Novia successfully negotiated for the final dismissal of the minority shareholders' claims against CBG and Weatherby. To the contrary: in late September 2015, Weatherby asked Novia to include language in the Mutual Release Agreement that would terminate the rights of the minority shareholders in CBG—again, of great benefit to Weatherby personally, whose majority stake in CBG would immediately grow ahead of the forthcoming 2016 FCC spectrum auction, but of no value to Novia should the Asset Purchase Agreement be terminated, as it was months before the auction.

Under New York law, the estopped party's conduct must have been incompatible with the contract's terms as written. *See Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283–84 (N.Y. 1977). Weatherby claims in his affidavit to have not made the decision to terminate the sale with Novia until the end of December 2015, but given the suspicious timing, a reasonable juror could

doubt the veracity of Weatherby's assertion. A juror could, quite reasonably, believe that Weatherby planned to exercise the right to terminate the contract with Novia but nevertheless solicited (and later accepted) favorable terms from Novia in the Mutual Release Agreement with the intent to terminate the Asset Purchase Agreement the minute he received the benefit of Novia's settlement with the minority shareholders. In that case, his solicitation of favorable terms from Novia, and subsequent acceptance of the benefits of those terms, was incompatible with his later reliance on the Asset Purchase Agreement's 270-day-termination provision to nix the sale to Novia. Accordingly, I would hold that a jury must decide whether CBG and Weatherby were estopped from terminating the Asset Purchase Agreement.